[No. 2886. Decided April 14, 1898.]

## THE STATE OF WASHINGTON, v. A. P. TUGWELL AND F. R. BAKER.

CONTEMPT OF COURT — WHAT CONSTITUTES — PENDENCY OF ACTIONS.

The constitutional guaranty that "every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right," does not grant immunity from the jurisdiction and process of courts in proceedings for contempt against those publishing articles reflecting on the court or judges thereof pending the trial of a case.

Under the inherent power vested in courts by the common law respecting the punishment of contempts and under the authority of Bal. Code, § 5798, providing that "disorderly, contemptuous, or insolent behavior toward the judge while holding court, tending to impair its authority, or to interrupt the due course of a trial or other judicial proceedings," shall be deemed a contempt of court, the publication in a newspaper, while a cause is pending on appeal before the supreme court, of an article reflecting on the integrity of the court, or of one of the judges thereof, and which tends to embarrass and disturb the conclusion of the court in the determination of the cause pending before it, is such conduct as to warrant the court's proceeding against the offender by attachment for contempt.

A cause on appeal to the supreme court of this state remains pending, and within the jurisdiction of the court to make any modification of its decision, until the final judgment has been rendered and the remittitur issued thereon.

*Original Proceeding for Contempt.*

*P. H. Winston*, Attorney General, *T. M. Vance*, Assistant Attorney General, and *A. R. Titlow*, for The State.

*Richard Winsor*, and *John C. Stallcup*, for defendants.

*Per Curiam:* On the 3d of March, 1898, the attorney general filed an information against, and moved for a rule upon, the defendants, to show cause why an attachment should not issue against them for contempt of court in re-

spect to the publication on the 24th of February, 1898, in a certain weekly newspaper in the city of Tacoma known as the Tacoma Sun, of the following article, to-wit:

" The supreme court of this state has again eased its conscience, if it ever had any to ease, by its infernal rotten decision in the Tacoma warrant case. . . . (naming a member of the court) can now sit snugly up alongside some other supreme simpletons and suck the hind teat of plutocracy. It is said that he changed his mind. Suffering saints, who ever made a charge that he had a mind to change? It is true he voted the other way when the case was up before, but nobody ever accused him of having a mind, and even if they did, after reading the decision in the warrant case referred to, which he is supposed to have written, they would know that the accusation had no foundation and could not be substantiated. This decision is only remarkable for its malignant, dishonest and damnable distortions of, not only the law, but also the facts. It states the facts shockingly contrary to the truth, as shown by the record in the case, as will be seen by the dissenting opinion that will soon be filed. It is the conception of an ass, a lean-witted, anile leripoop, who no doubt thinks he would rather be rich than be right. We speak of . . . more particularly because he flopped. What made him flop, he knows best, but every one else has a good idea. There is only one thing about . . . that pleases me, and that is his term soon ends, and he will be relegated to that everlasting oblivion that awaits all of these last rotten articles of republicanism. How long, O Merciful Creator of the Universe, are we to still suffer for the misdeeds of dishonest, corrupt and disreputable public servants? The people of Tacoma have lived in a wild and reckless revel of republican rule. They have drunk deep from the foul cup that folly has filled with perfumed poison and held to trusting lips, while the sweet sensuous song sung by satan's sirens, lulled the senses to fancied rest, security and safety as they plunged headlong into the frightful chasm of debt, at the bottom of which they will find destitution, destruction, dishonor and death. While yet money can be raised,

our citizens ought to erect a monument in memory of the past, to stand as a solemn warning for the future. The pedestal or base should be of busted banks, six stalwart representatives of republicanism, such, say, as Boggs and McCauley, Hedges and Holmes, Shane and McKane, should stand shoulder to shoulder with hands clasped and eyes raised with a look of envious emulation at the central figure yet above them all. And that figure should be . . . , on the top of a long shaft straddling the American eagle, in one hand a bunch of illegal warrants and in the other a double-barreled horse pistol as he commands fair Tacoma to kneel down and take one more dose of the vile, nauseating stuff, distillations of republican rottenness, that this supreme court has fixed up for us; then circling around all we would have the republican council dancing like diabolical demons trying to put out a huge bonfire made from the wreck and ruin of a light plant the city once owned, with imaginary water from a water plant for which the city paid more than a million real dollars. If all this could be placed in the public park where good pious people could go when the weather was nice and warm, and sit on the benches amidst the perfume of sweet flowers, with a picture of Grattan H. Wheeler in one hand and Walter J. Thompson in the other, oh, what a flood of tender memories would float over the soul! Oh, what a history, pages without printing, volumes without words. But Tacoma will never down, she will fight for justice till the last dishonest damn rascal that drags his slimy carcass across the road to justice shall have been fed to the crows. Men who have forgotten more law than . . . and his stud of supercilious asses ever knew, have studied this warrant question for months, and years; and they say the warrants have been paid; that they are dead and should not be paid again. This is only a touch of the tail end of republican prosperity of the past; but let us go on to the future. The day fast comes when the stains of disgrace and dishonor, those perfidious and pusillanimous tools of the trusts, have placed upon the fair name and fame of Washington, will be wiped out forever. We must fight the ground inch by inch until honest men, who see no

Klondike in the bench, shall be elected. Men who have the people's interests at heart, as well as the interest of the bondholder and warrant shark. This state will rise in its wrath and when fall comes, vicious, vacillating . . . will be swept into oblivion forever."

The information charged that the defendant Tugwell was editor and Baker was associate editor of the newspaper and that such publication was made of and concerning the cause of W. C. Bardsley, plaintiff, v. W. A. Sternberg, treasurer of the city of Tacoma, defendant, then pending in this court. The rule to show cause was issued and the defendants appeared and answered to the information. They admitted that on the 24th of February, 1898, defendant Tugwell was editor and defendant Baker, associate editor, of the weekly newspaper known as the Tacoma Sun, published in the city of Tacoma, and that they published the article set forth in the information. They denied that on the 24th day of February, 1898, or at any time thereafter there was still pending in this court the cause of *Bardsley v. Sternberg;* denied that by the publication of the article stated in the information they were guilty of any act or omission towards the court defined and deemed by the laws of the state to be a contempt of court; alleged that under the facts stated and under the laws and constitution of the state they had a right to publish the facts and comments as they appear in the article set out in the information; denied that they were amenable to the court for the publication; denied the right or power of the court to call upon them to answer as in these proceedings required, and denied that the publication amounted to a contempt. The attorney general thereupon demurred to the answer on the ground that it set up no defense and stated no reason why attachment should not issue against defendants. The facts relative to the pendency of the cause

of *Bardsley v. Sternberg* were of record in this court when the case was argued. The cause of *Bardsley v. Sternberg* was argued and submitted at the May session, 1897. On June 22, 1897, an opinion was filed by this court affirming the judgment of the superior court in such cause, two of the judges at that time dissenting from the opinion then filed. On July 20, 1897, counsel for the appellant Bardsley duly filed a petition for rehearing, and a rehearing thereafter was granted and the cause re-argued in this court. On February 18, 1898, the opinion of the court was filed reversing the judgment of the superior court. On February 24, 1898, a dissenting opinion in which two of the judges joined was filed. On February 28, 1898, a petition for a modification of the opinion of the majority of the court filed on the 18th day of February was filed in this court by Messrs. John P. Judson, John C. Stallcup and B. F. Heuston, attorneys for respondent, and on March 2, 1898, a majority opinion of the court was filed denying the last petition for modification of the opinion of reversal, and final judgment entered in the cause on the 2d day of March, 1898, and on March 9, 1898, the remittitur issued.

Art. 1, § 5, of the constitution of Washington, contained in the bill of rights, is as follows:

" Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right."

The statute of the state defining contempts, § 5798, Bal. Code (2 Hill's Code, § 778), is as follows:

" The following acts or omissions, in respect to a court of justice or proceedings therein, are deemed to be contempts of court:

" 1. Disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to impair its authority, or to interrupt the due course of a trial or other judicial proceedings;

" 2. A breach of the peace, boisterous conduct, or violent disturbance tending to interrupt the due course of a trial or other judicial proceeding;

" 3. Misbehavior in office, or other wilful neglect or violation of duty by an attorney, clerk, sheriff, or other person appointed or selected to perform a judicial or ministerial service;

" 4. Deceit, abuse of the process, or proceedings of the court by a party to an action, suit, or special proceeding;

" 5. Disobedience of any lawful judgment, decree, order, or process of the court;

" 6. Assuming to be an attorney or other officer of the court, and acting as such without authority in a particular instance;

" 7. Rescuing any person or property in the lawful custody of an officer, held by such officer under an order or process of such court;

" 8. Unlawfully detaining a witness or party to an action, suit, or proceeding while going to, remaining at, or returning from the court where the same is for trial;

" 9. Any other unlawful interference with the process or proceedings of a court;

" 10. Disobedience of a subpoena duly served, or refusing to be sworn or answer as a witness;

" 11. When summoned as a juror in a court, improperly conversing with a party to an action, suit, or proceeding to be tried at such court, or with any other person in relation to the merits of such action, suit, or proceeding, or receiving a communication from a party or other person in respect to it, without immediately disclosing the same to the court;

" 12. Disobedience by an inferior tribunal, magistrate, or officer of the lawful judgment, decree, order, or process of a superior court, or proceeding in an action, suit, or proceeding contrary to law, after such action, suit, or proceeding, shall have been removed from the jurisdiction of such inferior tribunal, magistrate or officer."

Sec. 5809 of the same code (2 Hill's Code, §789) is as follows:

" Persons proceeded against according to the provisions of this chapter are also liable to indictment [ or informa-

tion] for the same misconduct, if it be an indictable offense,
but the court before which a conviction is had on the indict-
ment [or information] in passing sentence shall take into
consideration the punishment before inflicted."

1. On the 25th day of February, 1898, a formal com-
munication was received by the court from a reputable
member of the bar of the city of Seattle enclosing a copy
of the newspaper containing the publication set out in the
information and praying its consideration by the court, and
on the same day the newspaper ·containing the publication
was  delivered  by  mail  to  several members of the court.
The communication and subject matter thereof were then
submitted to the attorney general by the court, and he
thereupon filed the information.   The principal question
raised by the answer of the defendants and argued by their
counsel is that under the facts above stated defendants had
a right to publish the facts and comments in the publication
set forth in the information.   It is also maintained by the
learned counsel for defendants that art. 1, § 5, of the con-
stitution of Washington guarantees to defendants, as
charged, immunity from the jurisdiction and process in the
nature of contempt of any court or judicial tribunal of any
character whatever.   In support of their contention counsel
for defendants have cited authorities from the courts of
some of the other states.   The case of *Dunham v. State,*
6 Iowa, 245, decided in 1858, was an appeal, from a con-
viction of contempt in the district court, of the editor of a
newspaper for publication of matter deemed offensive to
the court.   The Iowa statute, which was construed, defined
a contempt as "contemptuous or insolent behavior toward
the court, while engaged in the discharge of a judicial duty,
which may tend to impair the respect due to its authority."
The court said, after stating the acts of the respondent:

"  .   .   It will be observed, that, except in relation to
his comments, and the publication made of the proceedings

in his own case, on the first hearing, his articles had refer-
ence entirely to cases that were not before the court,"
and as

" . . . there was no rule, general or special, prohibiting
the publication of the speeches of counsel, remarks of the
court, or giving a statement of the proceedings,"

it did not, under the circumstances, amount to a contempt.
The court also observed:

" We are strongly inclined to think, however, that the
provisions of the code upon this subject, must be regarded
as a limitation upon the power of the courts, to punish for
any other contempts. We can conceive of no possible state
of case, in which the exercise of this power might become
necessary for the protection of the court, or the due admin-
istration of the law, that is not covered by these provisions.
If such a case should, by possibility arise, we would not
say that, by virtue of its inherent power, the punishment
might not be inflicted."

It will be observed in this case that the gravamen of the
publication made by the defendant was criticism and severe
denunciation of the district judge for rulings in two cases
which were finally concluded before the publication was
made, and the court does not seem to regard the
publication of proceedings occurring in a contempt
proceeding against the defendant as falling within
the statute, in the absence of a rule of the court
forbidding the publication of such proceedings while
still pending. In 1875 in the case of *State, v. Anderson,*
40 Iowa, 207, cited by counsel, the court referring to
*Dunham v. State, supra,* said:

" In that case it was held, that the publication of articles
in a newspaper, reflecting upon the conduct of a judge in
relation to a cause pending in court, which had been dis-
posed of before the publication, however unjust and libel-
ous the publication may be, did not amount to contemptu-
ous or violent behavior towards the court," under the stat-

ute, " nor that such articles were so calculated to impede, embarrass, or obstruct the court in the administration of the law as to justify the summary punishment of the offender," under the statute.

And in the case in hand the court said:

" The proceedings in the cause had been brought to a close, and what was said in the published article could in no manner influence the rulings of the court. The publication was not contemptuous or insolent behavior towards the court 'while engaged in the discharge of a judicial duty,' tending to impair the respect due to its authority."

And the court expressly concludes with this declaration:

" Whether, in case the article in question had been published while the court was engaged in the trial, or before the termination, of the cause in which the rulings of the court are criticised, it would have been sufficient to justify the court in punishing the author for contempt, we do not decide, for the reason that such state of case is not before us on the record."

It may be observed that these two cases do not decide whether, in Iowa, the court may punish contempts other than specified in the statute, nor whether the court would deem a publication tending to embarrass or influence the court in a pending cause a contempt, and therefore do not aid the court to any considerable extent in the case at bar. The case of *Storey v. People*, 79 Ill. 45 (22 Am. Rep. 158), was where a publication in a newspaper censured the action of the grand jury, questioned its integrity as a body and indirectly attacked the moral character of certain of its members; but the publication was made after the grand jury had acted upon, and returned, three indictments against defendant which had already been filed in the court, and at the time of the publication of the record there were no complaints pending before the grand jury of any kind against the defendant. The court said:

" The only question, therefore, is, assuming the articles to be libelous, whether the publishing of a libel on a grand jury, or on any of the members thereof, because of an act already done, may be summarily punished as a contempt.

" We do not understand the articles as having a tendency directly to impede, embarrass or obstruct the grand jury in the discharge of any of its duties remaining to be discharged after the publications were made. No allusion is made to any matter upon which the members were thereafter to act, and there could, therefore, of necessity, be no attempt to interfere with the exercise of their free and unbiased judgments as to such matters."

And the court, referring to the case of *People v. Wilson,* 64 Ill. 195 (16 Am. Rep. 528), defined precisely what was considered and adjudged in that case, ·

" that the cause in reference to which the article was published was *then pending* before the court, undecided, and that the article was *calculated* to, and was *designed* to influence the members of the court in deciding it."

And further observes that

" since the decision of that case the statutes have been revised, and the provision in regard to contempts, before quoted, has been repealed, leaving no statute in force on that subject, except in regard to the enforcement of decrees in chancery, and the punishment of certain specific offenses, such as the failure of jurors to attend in obedience to summons, the failure of officers to make service and return of writs, etc.,"

but observes:

" Courts, however, possess certain common law powers, subject to modifications that may have been imposed by our constitution and statutes, among which is included that of punishing for contempts."

The case of *Galland v. Galland,* 44 Cal. 475 (13 Am. Rep. 167), was one of contempt in a court of equity by a husband for not paying a monthly sum for his wife's sup-

port, which he had been adjudged to pay, and on appeal the supreme court merely decided that the defendant might purge himself from the contempt by showing that he was unable to pay it and that the inability had not been created by his own act. We presume the case was cited because of the following language of the opinion:

" In this state the power of courts to punish for contempt has been regulated by statute. . . . This is a limitation upon the power formerly exercised by courts to punish for contempt; but whether courts in this state can exercise power in this respect in cases not named in the statute, or otherwise than it has provided, we are not called upon in this case to consider. In our opinion, however, where one is called before a court to answer for contempt for not doing an act which he has been adjudged to do, inquiry may properly be had as to whether it is still in his power to do it, and if it be not, he should not be adjudged guilty . . . ."

We cannot perceive that the case is in point. The case of *Johnson v. Superior Court*, 63 Cal. 578, arose upon the refusal of the court to allow process to a defendant in a divorce suit on the ground that he had not obeyed the order of the court requiring him to pay plaintiff her costs and counsel fees. The California Code contained this provision:

" No statute, law or rule is continued in force because it is consistent with the provisions of this Code on the same subject; but in all cases provided for by this code, all statutes, laws and rules heretofore in force in this state, whether consistent or not with the provisions of this code, unless expressly continued in force by it, are repealed and abrogated."

The discussion in this case was upon the *quantum* and manner of the punishment that could be pronounced by the court for a disobedience of its order upon the defendant, and the court held that, the statute having prescribed the

punishment, such provision was controlling. Counsel for defendants seem to rely more particularly upon the case of *State v. Kaiser*, 20 Ore. 50 (23 Pac. 964). This, again, was a punishment by the district court of a publisher of a newspaper for a libelous publication concerning the judge of the court. The code of Oregon is identical with ours. The court observes:

" The inherent power of a court of justice to punish parties for contempt who commit acts which have a direct tendency to obstruct or embarrass its proceedings in matters pending before it, or to influence decisions regarding such matters, is undoubted; but it can hardly be maintained, from the adjudications had upon the subject in the various states, that such power is broad enough to vest in the court the authority to so punish any one for criticising the court on account of its procedure in matters which have fully terminated, however much its dignity and standing may be affected thereby, . . . In any event, it seems to me that the legislature has authority to limit the power of courts in regard to matters of contempt to the punishment only of such acts as are specified in the sections of the code above set out. . . .

" The publication, according to the general definition given by Blackstone, and by some of the more modern law-writers, upon the subject, would probably constitute contempt, but, under the code of this state, it does not; nor do I think it would according to the weight of decisions made under the constitutions of the various states. If it had reflected upon the conduct of the court with reference to a *pending suit, and tended in any manner to influence its decision therein*, it would, unquestionably, have been a contempt; but it was not shown that any suit was then pending by which the rights of any litigant were, or could have been, affected by it."

It will be observed the supreme court of Oregon, upon a statute identical with ours, holds that a publication tending to embarrass or influence the action of the court in a cause pending before it is contempt. All the cases cited by coun-

sel for the defendants have thus been examined, and in them does not seem to be found any substantial support of the principle of constitutional construction invoked here by them.

2. The constitutional liberty of speech and the press and the guaranties against its abridgment are found in the laws of all the American states, and the federal constitution, and undoubtedly primarily grew out of the censorship of articles intended for publication by public authority. Such a censorship was inconsistent with free institutions and with that free discussion of all public officers and agents required for the intelligent exercise of the right of suffrage, and thus the common law of libel was almost universally revised by statute so that the truth of the publication could be given in evidence as defense. The arbitrary rule existing in England before the American revolution was thus abrogated in this country. Parliament had assumed an extensive power to punish for contempt, as had likewise the English courts of common law. Under the rule frequently enforced by the English courts of that period, any criticism upon a judicial officer made at any time after the determination of the cause, of an offensive character, was deemed a contempt of court and thus the rule was dangerous to public and individual liberty. This rule, however, has long since been abrogated in England, and the law of contempt there may be said to be now similar to that announced by the great number of the American courts. Judge Cooley, on Constitutional Limitations (5th ed.), p. 521, says:

" The constitutional liberty of speech and of the press, as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing, except so far as such publications, from their blasphemy, obscenity, or scandalous character, may be a public offense, or as by their falsehood and malice they may injuriously affect the standing,

reputation, or pecuniary interests of individuals.   Or, to state the same thing in somewhat different words, we understand liberty of speech and of the press to imply not only liberty to publish, but complete immunity from legal censure and punishment for the publication, so long as it is not harmful in its character, when tested by such standards as the law affords.   For these standards we must look to the common law rules which were in force when the constitutional guaranties were established, and in reference to which they have been adopted."

And the same eminent jurist and commentator on constitutional law further says, at another place:

" It has also been held in many cases that the publication of an article in a newspaper commenting on proceedings in court then pending and undetermined, or upon the court in its relation thereto, made at a time and under circumstances   calculated to affect the course of justice in such proceedings, and obviously intended for that purpose, may be punished as a contempt, even though the court was not in session when the publication was made."

And Mr. Bishop, a leading commentator on American criminal law, says:

" By the commonly accepted doctrine, any publication whether by parties or strangers relating to a cause in court, tending to prejudice the public as to its merits, and to corrupt or embarrass the administration of justice—or reflecting on the tribunal or its proceedings, or on the parties, the jurors, the witnesses, or the counsel—may be visited as a contempt."   2 Bishop, New Criminal Law, § 259.

The learned editor of American Decisions, Mr. Freeman, in notes upon the *Case of Sturoc*, 97 Am. Dec. 630, states the rule from all the authorities:

" It has long been settled, and is now generally acknowledged, that certain publications in newspapers may amount to contempts of court, and may be summarily punished as such.   Publications pending a suit, reflecting upon   the court, the jury, the parties, the officers of the court, or the

attorneys, with reference to the suit, and having a tendency to influence the action of the tribunal before which the case is pending, is a contempt of that court, which may be summarily punished by attachment." 2 Story, Constitution, §§ 1774, 1884; *Ex parte Bollman*, 4 Cranch, 75; *Ex parte Kearney*, 7 Wheat. 38; *Anderson v. Dunn*, 6 Wheat. 204; *Ex parte Bergman*, 3 Wyo. 395 (26 Pac. 914); *Savin's Case*, 131 U. S. 267 (9 Sup. Ct. 699).

Rapalje, a careful authority on Contempt, says (p. 70, § 56), with reference to publications reflecting on the court or its proceedings:

" Any publication, pending a suit, reflecting on the court, the parties to the suit, the witnesses, the jurors or the counsel, is a contempt of court."

The common law was adopted at the organization of Washington Territory by the first legislative assembly. The state legislature enacted (Laws 1891, p. 31; Bal. Code, § 4783):

" The common law, so far as it is not inconsistent with the constitution and laws of the United States, or of the state of Washington, nor incompatible with the institutions and condition of society in this state, shall be the rule of decision in all the courts of this state."

The law of contempt as enacted by the legislature of this state and hereinbefore set out is declaratory of the common law of contempt as construed by the great majority of the American courts. This was the view held by the supreme court of Oregon in *State v. Kaiser*, *supra*, in construing the same statute. Chief Justice THAYER, in that case delivering the opinion of the court, said:

" As I view the said sections of the Code, they are little more than declaratory of the law upon the subject of contempt as understood by a large proportion of the courts of the several states at the time of their adoption."

And the various adjudications of the American courts
referred to have all had in view similar constitutional guar-
anties of freedom of speech and press as found in our state
constitution. The publisher of the article may be responsi-
ble in a civil or criminal action for libel, but if the article
is calculated to embarrass or influence a court or prevent a
fair trial between suitors in court either by disturbing the
independent verdict of the jury or the independent and un-
biased conclusion of the court, it is contempt, and a judge
of the court cannot in any action of libel, however it may
reflect upon him personally, recover damages for such con-
tempt. It is not a personal wrong and does not affect the
judge personally, but it is such an offence, as has been ob-
served, as alone affects the court and the administration of
justice, and the common law and statute affirmatory thereof
vest the punishment of such contempt in the court. The
legislature of this state has specified punishment for con-
tempts and has adopted the common law relating to them.
The rights of suitors in courts and of persons charged with
offences to a fair trial is guaranteed by our fundamental
law. This is a sacred right of very ancient origin. It was
the cause and is the only reason for the existence of the
judiciary as a co-ordinate department of the sovereignty
of the state. It is this right of impartial trial which is vio-
lated by the publication and submission of an article to the
court, while a cause is pending and yet undetermined, tend-
ing to embarrass or influence the court in its final conclu-
sion; and the individual liberty of the citizen is gone when
his personal rights are endangered, or lost by such extrane-
ous influences. It is this protection of the rights of suitors
in a judicial action which compels the courts to exercise
their jurisdiction of contempt. It is sometimes a delicate
power for the court to exercise. It will ordinarily much
more readily exercise its power to punish such contempts,

when the offensive acts have been directed toward the improper control or influence of a jury or witness or some officer of the court, for the reason that when such acts are directed toward a court there is always something of the appearance of the personality of the court involved. As observed by the supreme court of Illinois in *People v. Wilson*, 64 Ill. 214:

" The respondents are correct in saying in their answers that they have a right to examine the proceedings of any and every department of the government.

" Far be it from us to deny that right. Such freedom of the press is indispensable to the preservation of the freedom of the people. But certainly neither these respondents nor any intelligent person connected with the press, and having a just idea of its responsibilities as well as its powers, will claim that it may seek to control the administration of justice or influence the decision of pending causes.

" A court will, of course, endeavor to remain wholly uninfluenced by publications like that under consideration, but will the community believe that it is able to do so? Can it even be certain in regard to itself? Can men always be sure of their mental poise? A timid man might be influenced to yield, while a combative man would be driven in the opposite direction. Whether the actual influence is on one side or the other, so far as it is felt at all, it becomes dangerous to the administration of justice. Even if a court is happily composed of judges of such firm and equal temper that they remain wholly uninfluenced in either direction, nevertheless a disturbing element has been thrown into the council chamber, which it is the wise policy of the law to exclude. . . .

" It may be said that, as long as the court was conscious it had not been frightened from its propriety by the article in question, the wiser course would have been to pass it by in silence.

" So far as we are personally concerned, we should have preferred to do so. . . . But a majority of the court were of the opinion that this publication could not be dis-

regarded without infidelity to our duty.   By our relations to the bar, to the suitors in our court, to the entire judiciary of the state, and to the state itself, we felt constrained to call the persons responsible for this publication to account."

See, also, *State v. Faulds*, 17 Mont. 140 (42 Pac. 285); *In re Hughes*, 43 Pac. 692;   *People v. Stapleton*, 18 Col. 568;   (33 Pac. 167);   *Cooper v. People*, 13 Colo. 337 (22 Pac. 790);   *Commonwealth v. Dandridge*, 2 Va. Cas. 414; *State v. Frew*, 24 W. Va. 416 (49 Am. Rep. 257).   The last case cited is an exhaustive and thorough compilation of the American authorities upon the subject of contempt. The judiciary of this state was created by, and its jurisdiction and the specifications of its judicial functions written in, the constitution.   It receives its mandate from the sovereign people and it is responsible to them for the faithful discharge of its trust.   Its sole authority from them is to declare the law of the state and by its process enforce that law;   and it cannot make or revise any law.   It can no more decline the exercise of rightful authority in the determination of a case presented to it than it can overstep its rightful authority in the assumption of arbitrary power. A timorous judiciary, shrinking from a rightful declaration of the law, is alike dangerous to civil rights and personal liberty with a corrupt and arbitrary one.   As declared by the supreme court of Virginia in 2 Va. Cas. 414, from the standpoint of able jurists:

" They cannot but feel it a delicate and invidious task to define and decide upon the extent of their own powers, nor be ignorant, that the judgment they are called upon to render, may expose them on the one hand to the imputation of timidity and irresolution, or on the other, to that of usurpation and tyranny.   The verity of these suspicions would not be more unworthy of the judges than the fact of their shrinking from this question, because of the consequences in which themselves might be involved by it.

. . . . In this country, we know no privileges but such as exist for the public good. Many such privileges we have; from those which appertain to the legislature itself even down to such as belong to the lowest executive officer. Those, which surround the administration of justice, belong to the same order. Courts, their officers and process, are shielded from invasion and insult, not from any imaginary sanctity in the institutions themselves, or the persons of those who compose them (as in the political and ecclesiastical establishments of another hemisphere), but solely for the purpose of giving them their due weight and authority, and to enable those who administer them, to discharge their functions with impartiality, fidelity and effect. This is the true test of every privilege, not granted by statute, and is the spirit of every one (not merely private), which is so secured."

The court in the case at bar has concluded that the publication made by the defendants, if published while the case of *Bardsley v. Sternberg* was pending here, under the facts above stated is a contempt under the laws of this state. In such conclusion it is not intended to intimate or suggest that any citizen of the state has not a legal right to comment upon, criticise and freely and without restriction from any lawful authority discuss any cause determined by any of the courts of this state after the final disposition of such case; or that any restriction of fair and impartial reporting of cases pending in courts, unless forbidden by rule, is now imposed by our laws. The officers who compose the courts are selected by the people of the state for the discharge of their duties. The freest discussion of individual merits, capacity and character is necessary for an intelligent exercise of suffrage in the election of judges as of all other officers of the state. An action has been deemed pending in this court until the remittitur issued, but counsel have argued that although the statute does not determine when jurisdiction ends in this court, yet the court having been

authorized by statute to frame rules has by its rules determined the question of the conclusion of the case, and refers to Rule XIII:

" 1. Every petition for rehearing must be filed within thirty days after the opinion shall have been rendered, and no more than one petition for a rehearing of the same question shall be filed; *Provided*, That the court may, in its discretion, allow any petition to be amended. The filing of a petition for rehearing shall suspend the decision of the court until a ruling thereon."

Elliott on Appellate Procedure says, § 558: "A second petition from the same party will not be considered." And that has been the practice in this court. The first opinion in the cause was followed by a petition for rehearing on the part of the appellant. Leave to print and file additional briefs was granted by the court and the case assigned regularly and reargued orally in the court, and the opinion of the majority of the court then filed, reversing the judgment of the superior court. A petition was then filed by counsel for respondent praying for an important modification of the opinion filed, and subsequently an opinion filed denying such modification. There can be no doubt of the jurisdiction of this court over the cause and the power to make any modification of its opinion, until the final judgment was rendered and until the remittitur issued. Under the law, the courts in this state are always in session, in legal contemplation.

" An action is ' pending ' . . . until the judgment is fully certified." Anderson's Law Dictionary, Verb. Pend.

See *Ulshafer v. Stewart*, 71 Pa. St. 170; *Holland v. Fox*, 3 El. & Bl. (Q. B.) 977; *Wegman v. Childs*, 41 N. Y. 159; Hayne, New Trial, §§ 292, 293. From an inspection of the article set out in the information it

17—19 WASH.

·can readily be perceived that, thrust into the court before its final deliberation and final expression in the cause of *Bardsley v. Sternberg*, it comes within all the authorities as tending to embarrass and disturb the conclusion of the tribunal in the determination of the cause pending before it.

In determining the punishment that the judgment of the court will affix to the contempt in this case the court has taken into consideration that this is the first offence formally brought to its attention in the history of the state, and the maximum penalty affixed by the statute is reduced for that reason.