[Criminal No. 395.   Filed December 11, 1915.]

[153 Pac. 451.]

In the Matter of Proceedings Against R. B. SIMS, Warden, for Contempt. STATE, at the Relation of WILEY E. JONES, Attorney General, Appellant, v. R. B. SIMS, Respondent.

1. PARDON — DEATH SENTENCE — POWER TO SUSPEND.— Penal Code of 1913, section 1140, placing the power in the Governor to suspend the execution of a death sentence, means that he may exercise such power upon the request of the board of pardons and paroles.

2. PARDON—DEATH SENTENCE—POWER TO SUSPEND—SUPERINTENDENT OF STATE PRISON.—Penal Code of 1913, section 1140, gives power to the superintendent of the state prison to suspend the execution of a death sentence only on the conditions and for the reasons set forth "in the six succeeding sections."

3. PARDON—DEATH SENTENCE—POWER TO SUSPEND—VERDICT.—Under Penal Code of 1913, sections 1140–1144, providing for an inquiry by a jury into the sanity of a person sentenced to death and in the custody of the superintendent of the state prison for execution, upon notice by the superintendent to the county attorney, the power of the superintendent to suspend execution of sentence provided for in paragraph 1140 is given only upon the verdict of the jury, trying such sanity issue, that the prisoner is insane.

[As to power of court to suspend sentence in criminal case, see note in Ann. Cas. 1912B, 1192.]

4. PARDON—DEATH SENTENCE—SUSPENSION—ORDER.—Such authority of a superintendent of a state prison to suspend the execution of a death sentence is an order of the court, based upon a verdict by

the jury trying the sanity issue, as provided in Penal Code of 1913, section 1143.

5. PARDON—DEATH SENTENCE—SUSPENSION—POWER OF STATE PRISON SUPERINTENDENT.—If the proceedings to try the prisoner's sanity under Penal Code of 1913, section 1140 et seq., are initiated at a time too late to be determined before the expiration of the death warrant, the superintendent has no power to suspend execution of the death sentence, such power residing in the Governor alone upon the recommendation of the board of pardons and paroles.

6. CRIMINAL LAW—DEATH SENTENCE—SUSPENSION—SANITY TRIAL.— The summary trial of the question of the prisoner's sanity, under Penal Code of 1913, section 1141 et seq., can only take place when the prisoner has become insane after his delivery to the superintendent.

7. PARDON — DEATH SENTENCE — SUSPENSION — STATE PRISON SUPERINTENDENT.—The superintendent of a state prison, has no power, under Penal Code of 1913, section 1141, to suspend execution of a prisoner's death sentence by virtue of his opinion that the prisoner was insane at the time of his trial for the crime.

8. CONTEMPT—WHEN PURGED.—The court may, in a proper case, accept the disavowal of intentional misconduct of one in contempt of court for disobedience to its order, as purging the contempt.

Proceedings in contempt. Respondent discharged.

Mr. Wiley E. Jones, Attorney General, and Mr. Leslie C. Hardy and Mr. Geo. W. Harben, Assistant Attorneys General, for Plaintiff.

Mr. George J. Stoneman and Messrs. O'Connor & Conmy, for Respondent.

ROSS, C. J.—This proceeding grows out of the case of the *State of Arizona* v. *William Faltin,* upon the following facts: On the twenty-fifth day of January, 1913, a jury of Maricopa county found William Faltin guilty of murder in the first degree, and fixed the penalty at death. Faltin prosecuted an appeal from the judgment of conviction to this court. Pending the appeal he was in charge of the respondent, Sims, at the state prison at Florence. On September 23, 1915, the judgment of the superior court of Maricopa county was affirmed by this court, and, the time fixed by such judgment for the execution thereof having passed before the decision of the supreme court on appeal, this court in its judgment of

affirmance, as is made its duty in such cases by paragraph 1177 of the Penal Code of 1913, fixed the time when the original sentence of death should be executed, and caused a copy of such judgment, duly certified by the clerk of this court, to be delivered to the respondent, who was then and is now the superintendent of the state prison, the said copy of judgment being made by law sufficient authority to the superintendent for the execution of the said William Faltin. The time fixed by said judgment for the execution of Faltin was November 26, 1915. On the 27th of November the attorney general filed his affidavit in this court, in which he stated, among other things not material here, that the respondent had refused to comply with and carry out the order and directions of this court to him to execute the sentence of death upon Faltin on the twenty-sixth day of November, 1915. A citation was directed to respondent to show cause, if any he had, why he should not be punished for contempt for disobeying the court's judgment. Respondent answered the citation and order to show cause by: (1) Disavowing any intention of disobeying, or failure to obey, the order or process of the court; (2) admitting that he received the certified copy of judgment on or about September 23, 1915, commanding him to execute Faltin on the twenty-sixth day of November, 1915, and alleging that he had made all necessary preparations to carry out the order of the court as directed, and that he would have done so had he not, on the twenty-fifth day of November, 1915, received a statement in writing, signed by Dr. W. G. Randell, who was then, and had been for a long time prior thereto, the regular physician of the state prison, observing Faltin for the purpose of determining his sanity, and Dr. O. E. Plath, a regularly licensed, reputable and qualified physician, who was in possession of full knowledge of the facts as recited to him by Dr Randell, and after a personal examination, said statement in writing being to the effect that said physicians were of the opinion that from all of the evidence presented to them, Faltin was insane, with the recommendation that steps be taken to determine the question; and (3), believing from his own observation and the expression of opinion of the physicians that there was good reason to believe Faltin to be insane, he on November 25th called such fact to the attention of the county attorney of Pinal county,

as provided by paragraphs 1141, 1142, 1143 and 1144 of the Penal Code of 1913. As a precedent and justification for the course pursued by him in the *Faltin Case*, respondent sets forth in his answer the steps taken by the attorney general and the board of pardons and paroles to postpone the execution of one Walter Kermeen pending the investigation of his sanity, in which it is shown that the board of pardons and paroles co-operated with respondent in securing a reprieve in the *Kermeen Case* until December 10, 1915, to permit an inquiry into his sanity. In the *Kermeen Case*, as shown by the answer, Dr. Randell, on November 9th, notified the board that it was his opinion that Kermeen was insane, and respondent appeared before the board on November 12th and stated that he "was convinced fully in his own mind that Kermeen is now insane."

The question of respondent's guilt or innocence will be determined upon the affidavit of the attorney general and the answer of the respondent. The answer, not having been traversed by the attorney general, will be taken as true.

It is the contention of the respondent, as we understand his answer, that he was acting, in not executing the death warrant at the time fixed, in accordance with the spirit, if not the letter, of the law; that the power to suspend the execution in the manner that he did is conferred upon him by the statute. A casual consideration of the statutes should have convinced him, or anyone searching the law, that he is mistaken in that view. Paragraph 1140 of the Penal Code provides that:

"No judge, court, or officer, other than the Governor, can suspend the execution of a judgment of death, except the superintendent of the state prison, to whom the condemned person is delivered for execution, as provided in the six succeeding sections, unless an appeal is taken."

It will be seen that this paragraph places the power of suspending the execution of a judgment of death in the Governor, meaning thereby that the Governor, upon the request of the board of pardons and paroles, may reprieve the condemned person, and in the superintendent of the state prison on the conditions and for the reasons set forth "in the six succeeding sections." Paragraph 1141 provides that:

"If, after the delivery to the superintendent for execution, there is good reason to believe that a defendant, under judg-

ment of death, has become insane, the superintendent must call such fact to the attention of the county attorney . . . in which the prison is situated, whose duty it is to immediately file in the superior court of such county a petition, stating the conviction and judgment and the fact that the defendant is believed to be insane, and asking that the question of his sanity be inquired into."

The act here required of the superintendent, it will be seen, does not have the effect of suspending the death warrant. The simple and plain duty of the superintendent is to call his belief of the prisoner's insanity to the attention of the county attorney, whose duty it is to initiate proceedings in the superior court, so that the question of the sanity of the person may be inquired into. For that purpose "the court must at once cause to be summoned and impaneled from the regular jury list of the county, a jury of twelve persons to hear such inquiry."

Paragraph 1142 provides that the county attorney must attend the hearing, and that he may produce witnesses before the jury, and that he may issue subpoenas in his own name for such witnesses as he may require.

Paragraph 1143 provides that: "The verdict of the jury must be entered upon the minutes, and thereupon the court must make and cause to be entered an order reciting the fact of such inquiry and the result thereof, and when it is found that the defendant is insane the order must direct that he be taken to the state asylum for the insane, and there kept in safe confinement until his reason is restored."

Paragraph 1144 provides that: "If it be found that the defendant is sane, the superintendent must proceed to execute the judgment as specified in the warrant; if it is found that the defendant is insane, the superintendent must suspend the execution, and transmit a certified copy of the order mentioned in the last section to the Governor, and deliver the defendant, together with a certified copy of such order, to the medical superintendent of the asylum named in such order."

It is only upon the verdict of the jury to the effect that the person is insane that the superintendent is authorized to suspend the execution. He has no power to determine the question of the prisoner's sanity or insanity. He can, if he has good reason to believe that the prisoner has become in-

sane since his delivery to the prison, only call such fact to the attention of the county attorney, and the law evidently contemplates that he shall do this at a time long enough before the date fixed for the execution of the death warrant, so that the judicial inquiry provided for may be had before the death warrant becomes *functus officio,* or at least in time to secure a reprieve.

If on the day set for the execution, the hearing upon the question of the sanity of the prisoner has not been had and the verdict of the jury entered upon the minutes of the court, and no reprieve, commutation or pardon has been granted, it is the duty of the superintendent to carry into effect the judgment of the court. His authority for suspending the execution is an order of the court, based upon the verdict of the jury, as provided in paragraph 1143. If the proceedings to determine the question of the prisoner's sanity are initiated at a time too late to be determined before the expiration of the death warrant, upon the recommendation of the board of pardons and paroles to the Governor, he, and he only, may reprieve the death sentence to some future date, to allow the question of the prisoner's sanity to be determined, but the superintendent has no power to do so.

The summary trial of the question of the prisoner's sanity, provided for in the above paragraphs, can only take place when the prisoner "has become insane" after his delivery to the superintendent.

The question of Faltin's sanity at the time of his trial for murder was as much an issue before the jury as any other issue in his case, and the verdict of guilty, returned by the jury, resolved that question in favor of his sanity. The presumption of the law is that Faltin was sane when he was delivered to the superintendent, and this presumption is irrebuttable. The superintendent of the prison cannot substitute his opinion, nor the opinion of physicians, for the verdict of the jury and the judgment of conviction, and say in his judgment Faltin was insane at the time of his trial and conviction. The certificate of the physicians, upon which respondent relies for a justification of his action, is as follows:

"We certify that from all the evidence presented, we believe William Faltin to be insane. . . . "

Respondent states his convictions in that regard in his answer as follows:

"Believing that there was and now is good reason for believing the said William Faltin to be insane. . . . "

It is not shown "whether the mental unsoundness be congenital or a result of arrested mental development, of religious excitement, of physical disease, of old age, or of unknown causes; whether it be casual, temporary, or permanent; whether it be personal or hereditary; whether it be manifest in the mildest dementia or the wildest mania."

The insanity of the prisoner that the law authorizes the superintendent to call to the attention of the county attorney is insanity that is recent or developed after his delivery to the superintendent; and, as before said, we cannot tell from the showing made by the defendant whether he believed the prisoner mentally unsound before or after the commission of the crime, or before or after Faltin's trial, or before or after his commitment to the state prison. The difference in the respondent's conduct in the *Kermeen Case* and in the *Faltin Case* is very marked. In the *Kermeen Case* he solicited the co-operation of the board of pardons and paroles to secure a reprieve of the death sentence to a time in the future, so that the question of Kermeen's sanity might be determined before the death warrant had expired. He, himself, did not suspend the sentence in the *Kermeen Case*, but it was suspended by virtue of a reprieve from the Governor, upon the recommendation of the board of pardons and paroles. Steps were taken in the *Kermeen Case,* in which the respondent participated, long enough before the day set for his execution to preserve and keep alive the death warrant by means of a reprieve. No such orderly or regular proceeding was pursued in the *Faltin Case,* but the respondent, without warrant or authority of law, on his own initiative, suspended the execution and permitted the death warrant to become *functus officio.*

What seems passing strange and incomprehensible is that the discovery of Faltin's insanity should have been made so near the time fixed for his execution, and that, too, upon a legal holiday, Thanksgiving, made by our Constitution a non-judicial day. Indeed, although the respondent says in his answer that he called the attention of the county attorney of

Pinal county to his belief of the prisoner's insanity on the 25th of November, this, being a legal holiday, rendered impossible any action to be taken before the very day set for the execution. Had Faltin but recently been committed to the custody of the superintendent of the prison, the discovery of his mental unsoundness at so late a date would not cause so much wonder and surprise, but the facts are that Faltin had been in the care, custody and under the observation of the respondent almost three years. It would seem that at the time the death warrant was delivered to the superintendent, to wit, September 23, 1915, he would have had, and the physician of the state prison would have had, ample opportunity to have known whether Faltin was insane or not. More than 60 days elapsed, after his reception of the death warrant, before the day fixed for the execution thereof. It would appear not unreasonable to expect and require one whose duty it was to act in the premises to select a date early enough that the law's mandate might be carried out, rather than to select a date that could have no other effect than to frustrate, annul and defeat the law's demands.

Of course, it must be understood that men's opinions and wishes cannot be substituted and made to take the place of the law; that this is a government of laws, and not of men, and that those persons whom the people have chosen to execute the laws must do so, however disagreeable or repugnant to their wishes it may be. It is not a jealousy of our processes that calls forth this expression, but jealousy of the law as it exists. The people and their representatives make the laws, and their observation and enforcement is the only sure test of loyalty and certain guaranty of the perpetuity of our government.

The respondent in his answer, and also by counsel who represented him, disavowed any purpose or intent to disobey the order and judgment of the court. That he is guilty of a violation of the commands and directions of the death warrant issued by this court seems quite certain. We have, however, taken into consideration the fact that he is not learned in the law and might, therefore, have misconceived his duties in the premises and, without any disrespect to the court or its order, or to the law, have fallen into the error of doing as he did. We cannot know the secrets of his heart nor the opera-

tions of his mind. We would prefer to err on the side of mercy rather than to punish one the quality of whose guilt is not certainly known to be knowingly disobedient. Also the well-known probity and veracity of the respondent are elements in his favor. We therefore accept the respondent's disavowal of any intention to disobey the judgment of this court at its full measure and give it the force and effect of purging the contempt. Courts have sometimes accepted disavowals, when satisfied of their sincerity, and discharged the accused without the imposition of any fine or imprisonment. 9 Cyc. 26.

The respondent is therefore discharged.

FRANKLIN, J., concurs.

CUNNINGHAM, J.—I concur specially in the order discharging the respondent.

I do not concur in the purpose of the proceeding, nor in the interpretation placed on the statutes involved; nor in the reasons given by the majority of the court for the order. My reasons I will withhold, because I deem the ends of justice have been met by the discharge of the respondent, and the occasion does not exist calling for the reasons of the minority member of the court.