[Civil No. 2086.  Filed December 30, 1922.]

[211 Pac. 576.]

CLEVE W. VAN DYKE, WALTER J. SCOTT and
     THE SOUTHERN ARIZONA PUBLISHING
     COMPANY, a Corporation, Relators, v. THE
     SUPERIOR COURT OF GILA COUNTY,
     ARIZONA, and J. E. CROSBY, Judge of the
     Superior Court of Navajo County, Arizona, Act-
     ing as Judge of the Superior Court of Gila
     County, Arizona, Respondents.

1. PROHIBITION—WHEN ISSUANCE OF WRIT IS DISCRETIONARY.—Where
     it appears that a court whose action is sought to be prohibited has
     clearly no jurisdiction of the cause originally, or of some col-

---

On statement with respect to ended cause as contempt of court,
see notes in 3 Ann. Cas. 763; 18 Ann. Cas. 664; 68 L. R. A. 251.

Publication reflecting upon defendant in a criminal case as con-
tempt is discussed in note in L. R. A. 1917E, 713.

lateral matter arising therein, a party who has objected to the jurisdiction at the outset, and has no other remedy, is entitled to a writ of prohibition as a matter of right, but where there is another legal remedy by appeal or otherwise, or where the question of the jurisdiction is doubtful or depends on facts which are not made a matter of record, or where the application is made by a stranger, the granting or refusal of the writ is discretionary.

2. PROHIBITION—WRIT NOT ORDINARILY USED AS PROCESS FOR REVIEW AND CORRECTION OF ERRORS.—A writ of prohibition may not ordinarily be used as a process for the review and correction of errors committed by inferior tribunals.

3. PROHIBITION—MERE ERRORS, IRREGULARITIES OR MISTAKES DO NOT JUSTIFY RESORT TO WRIT.—Mere error, irregularity or mistake in the proceedings of a court having jurisdiction do not justify a resort to the extraordinary remedy by prohibition, both because there has been no usurpation or abuse of power, and because there exist other adequate remedies.

4. CONTEMPT—PUBLICATION HELD NOT CONTEMPTUOUS.—A newspaper article, stating that the "court wants names of" certain persons on the ballot, *held* not contemptuous, as tending to obstruct justice in a pending cause; no reference being made to the pending injunction cause.

5. CONTEMPT—NEWSPAPER ARTICLE HELD CRIMINALLY CONTEMPTUOUS. Newspaper articles, concerning litigation involving candidates for election, to the effect that it was no accident which placed on the bench the judge hearing the case, and that such judge had no sympathy with the growth and development of the Democratic forces of the city, that certain capitalists expected to march into court and secure an injunction and win an election, that the power of injunction has been twisted from the protection of property rights until it has been successfully turned into "government by injunction," etc., *held* criminally contemptuous.

6. CONTEMPT—"CIVIL CONTEMPT" AND "CRIMINAL CONTEMPT" DISTINGUISHED.—"Criminal contempts" are acts which obstruct the administration of justice or tend to bring the court into disrepute, as distinguished from "civil contempts," which exist in failing to do something which the contemnor is ordered by the court to do for the benefit or advantage of another party to the proceeding before the court.

7. CONTEMPT—ACCUSATORY PAPER MUST STATE FACTS CONSTITUTING OFFENSE.—In a criminal contempt proceeding, the affidavit or information or other accusatory paper upon which the proceedings are founded shall state facts which, if established, constitute the offense, and if the charge is not sufficient in such respect, the court is without jurisdiction to proceed.

8. CONTEMPT—ACCUSATION NEED NOT BE DIRECT AND SPECIFIC.—At least, in the absence of statutory requirement, accusation in crimi-

nal contempt proceeding need not be as direct, specific, and certain as is required by law in indictments or informations for criminal offenses.

9. CONTEMPT—INNUENDO HELD NOT REQUIRED TO SHOW CONTEMPTUOUS CHARACTER OF PUBLICATIONS CONCERNING PENDING CAUSE.—In criminal contempt proceeding, accusatory paper *held* not subject to the objection that some innuendo was required to show the contemptuous character of the publications.

10. CONTEMPT — PROCEEDINGS NEED NOT BE HAD IN NAME OF STATE — "PROSECUTION."—Criminal contempt proceedings need not be had in the name of the state, nor the affidavit be so entitled, under Penal Code of 1913, section 751; the proceeding not being a "prosecution" within Constitution, article 6, section 20.

11. CONTEMPT — PUBLISHED ARTICLES HELD PROPERLY ATTACHED TO AFFIDAVIT AS EXHIBIT.—An affidavit in criminal contempt proceedings was not insufficient because the published articles complained of were attached merely as exhibits, where the affidavit contained a direct allegation that the publication in question had been actually made.

12. CONTEMPT—NEITHER A CIVIL NOR A CRIMINAL ACTION.—A criminal contempt proceeding is in no sense a civil action, and is not a criminal action which should be prosecuted by indictment or information as provided by Constitution, article 2, Penal Code of 1913, section 750.

13. JUDGES—NO CHANGE OF JUDGE IN CRIMINAL CONTEMPT PROCEEDING. In a criminal contempt proceeding, the judge was not deprived of jurisdiction by filing of affidavits, charging him with bias and prejudice in accordance with Civil Code of 1913, paragraph 500, as amended by Session Laws of 1921, chapter 107, and Penal Code of 1913, section 999.

14. CONTEMPT—NEWSPAPER PUBLICATIONS MAY AMOUNT TO CONTEMPTS OF COURT.—Newspaper publications may amount to contempts of court, and particularly publications pending a suit, reflecting on the court, the jury, counsel, parties or witnesses, or commenting on the case, and the weight and credibility of the testimony adduced or to be adduced therein, which articles are calculated to influence or embarrass the action of the tribunal before which the case is pending in deciding the case on its merits, must be considered as contempts of that court, because they obstruct the administration of justice therein.

15. CONTEMPT—SUMMARY PUNISHMENT FOR PUBLISHER OF NEWSPAPER ARTICLES.—One guilty of obstructing administration of justice by publication of a newspaper article may be punished summarily by attachment.

16. CONTEMPT — PROCEEDINGS TO BE PROSECUTED BEFORE COURT IN WHICH CONTEMPT COMMITTED.—Proceedings to punish for publica-

tion in newspaper obstructing administration of justice in a pending cause are to be prosecuted before the court in which the contempt was committed, and before that court alone.

17. JURY—PUBLISHER OF NEWSPAPER OBSTRUCTING ADMINISTRATION OF JUSTICE NOT ENTITLED TO JURY TRIAL.—One who published newspaper article tending to obstruct administration of justice · in a pending cause may be punished after a hearing before the court contemned without the intervention of a jury, under Civil Code of 1913, paragraphs 1798–1804.

18. COMMON LAW — LAWS AND USAGES DEDUCED FROM USAGES IN STATES HAVING COMMON LAW AS BASIS OF JURISPRUDENCE IN ABSENCE OF PRECEDENT.—To ascertain laws and usages at the time of the adoption of a statute, there being no authoritative precedent in the jurisdiction, it is necessary to investigate the then prevailing usages in states having the common law as the basis of their jurisprudence, such usages prevailing within the jurisdiction in the sense that they are implicit in the common law itself.

19. PROHIBITION—JURISDICTION OF CONTEMPT PROCEEDING NOT LOST BY REQUIRING CONTEMNORS TO FILE SWORN ANSWERS.—Court, in criminal contempt proceedings, did not lose jurisdiction so as to warrant prohibition because refusing to accept from contemnors pleas of not guilty to the affidavit in contempt, but requiring the filing of answers under oath, though such an order might, under certain circumstances, be erroneous.

20. CONTEMPT—SWORN ANSWERS OF ALLEGED CONTEMNORS NOT CON- · CLUSIVE SO AS TO FULLY PURGE CONTEMPT.—Court, in criminal contempt proceedings, did not exceed its jurisdiction in refusing to accept sworn answers of the contemnor as conclusive, so as to fully purge the contempt charged; the determination of the fact, whether erroneously or correctly decided, still being within the jurisdiction of the court.

21. CONTEMPT—WHETHER PUBLICATION CONTEMPTUOUS ORDINARILY ASCERTAINED WITHOUT REGARD TO INTENT.—Whether language in newspaper article concerning pending cause is contemptuous is ordinarily ascertained by its manifest meaning and effect, without regard to the intent with which it was used.

22. CONTEMPT — CAUSE NOT PENDING AFTER DENIAL OF MOTION FOR NEW TRIAL.—As respects contemptuous publications as to pending causes, upon the denial of a new trial, a case is no longer pending in the superior court.

23. CONTEMPT—PUBLICATION CONCERNING CAUSE TERMINATED NOT CONTEMPTUOUS.—In view of Constitution, article 2, section 6, newspaper publications, containing defamatory comments on conduct of judge, though libelous, do not constitute a contempt, even though they may well embarrass the court in other and pending litigations, where such publications are made after the termination of the cause to which they refer.

24. PROHIBITION — ADEQUATE REMEDY HELD NOT TO EXIST, WHERE
    COURT WRONGFULLY PROCEEDING FOR CONTEMPT AFTER TERMINA-
    TION OF CAUSE.—Publishers of newspaper articles, not contemptu-
    ous because made after termination of pending cause to which
    they referred, had no adequate remedy, where being proceeded
    against in criminal contempt, and were entitled to issuance of writ
    of prohibition, in view of Civil Code of 1913, paragraphs 1227,
    1802.

25. CONTEMPT—NO APPEAL FROM CONVICTION FOR CONTEMPT CONCERN-
    ING PENDING CAUSE.—No appeal lies from conviction for criminal
    contempt, consisting of publications concerning pending causes
    tending to obstruct the administration of justice, in view of Civil
    Code of 1913, paragraphs 1227, 1802.

Original proceeding for Writ of Prohibition. Al-
ternative writ granted; upon hearing to determine
whether writ should be made absolute, modified
relief granted.

Messrs. Jacobs & Partridge, Mr. Charles L. Raw-
lins, and Mr. D. L. Cunningham, for Relators.

Mr. Clifton Mathews, for Respondents.

FLANIGAN, J.—This proceeding originated in
this court upon the petition of the relators, Van
Dyke, Scott and the Southern Arizona Publishing
Company, for the issuance of an alternative writ of
prohibition directed to the respondents, the superior
court of Gila county and J. E. CROSBY, Judge of the
superior court of Navajo county, acting as judge of
the superior court of Gila county, praying that the
said respondents be prohibited from taking further
action in certain contempt proceedings then pending
in said superior court against the relators.

Due to different understandings concerning the
notice to be given of the hearing on the application
for the alternative writ, respondents did not attend
such hearing, and the alternative writ was issued as
prayed for, and the respondents were ordered to
show cause before this court why the writ should not

be made absolute. Pursuant to this order the respondents appeared, and demurred to the petition upon the ground that the facts alleged therein are not sufficient to warrant the issuance of the writ, and by answer admitted the truth of the substantial averments set forth in the petition. From the allegations of the petition we state so much of the facts as are necessary to present the questions involved.

On April 27, 1922, George M. Elledge, on behalf of himself and other taxpayers and voters of the town of Miami, Gila county, Arizona, filed in the superior court of that county his verified complaint, as plaintiff, against L. D. Van Dyke, mayor of the town of Miami, George R. Raynolds, clerk of said town, George F. Senner, town attorney thereof, Southern Arizona Publishing Company, a corporation, Roy Kelley, King C. Light, James Elzie Owen, M. S. Quinleven, Al Schatzkey, Arthur Turner, L. D. Van Dyke, and the town of Miami, defendants, alleging in said complaint that a certain primary election held in said town on April 5, 1922, was null and void and ineffectual for any purpose whatsoever, because of certain fraudulent and unlawful acts committed by said defendants, and especially because of the fraudulent and unlawful manner in which said pretended primary election was called and held, all of which was fully described in the complaint. The complaint prayed for an order requiring the defendants to appear and show cause why said primary election should not be declared null and void and why a permanent injunction and restraining order should not issue to enjoin defendants from taking any step to issue the ballots to be used at an election within said town called for May 22, 1922, on which ballots should be printed, written or in any way set forth, the names of the defendants Kelley, Light, Quinleven, Schatzkey, Turner, Owen and Van Dyke; also

from alleging or holding out to any voter, or voters, any assertion that said defendants, or any of them, had been regularly or lawfully nominated as candidates of the Democratic, or any other party, for officers of the town council of the town of Miami.

Upon the filing of the complaint an order was issued as prayed, requiring the defendants to show cause on May 9th why the permanent injunction and restraining order should not issue, and this order was served on the defendants. Thereafter, on May 8th, the defendants made affidavit in accordance with paragraph 500, Revised Statutes of Arizona of 1913, that they had reason to believe, and did believe, that on account of the bias and prejudice of the presiding Judge, Hon. G. W. SHUTE, they could not obtain a fair and-impartial trial of said cause before him.

Accordingly, on May 9th, Judge SHUTE requested Judge J. E. CROSBY, Judge of the superior court of Navajo county, to preside at the trial of said cause and to hear all matters involved therein, and the cause was thereupon continued until May 10th to enable Judge CROSBY to comply with such request. On that day Judge CROSBY presided over the superior court of Gila county at the trial of the cause, and thereafter heard all matters subsequently presented therein. On May 10th the defendants demurred and answered to the complaint. On May 11th the demurrer was overruled, and the cause tried, argued and submitted, and by the judge taken under advisement. On May 12th, in the forenoon, Judge CROSBY announced his opinion that the plaintiff Elledge was entitled to judgment declaring and adjudging the actions of the defendants Van Dyke, Quinleven, Turner and Collins, as the mayor and common council of the town of Miami, in calling the primary election of April 5th, to be fraudulent and ineffectual in so far as the defendants Van Dyke,

Turner and Quinleven were concerned, and that said defendants were not entitled to any rights under said primary election, nor to have their names set forth on the official ballots for the town election to be held on May 22d, and enjoined and restrained all the defendants accordingly from posting, printing, publishing, circulating or furnishing to the voters any official ballot or ballots for said election on which were printed or written the names of said defendants as the candidates of the Democratic or any other party. The defendants thereupon filed motion for a new trial, which was presented, argued and taken under advisement. At 9 o'clock in the evening of that day a formal judgment, in accordance with the announcement of the court, was signed, and at the same time the motion for new trial was denied. On May 13th the defendants gave notice of appeal to this court from such judgment, but have never perfected such appeal by giving the undertaking required by law.

It further appears that the relator the Southern Arizona Publishing Company at all said times owned and published in the town of Miami a certain newspaper known as the "Daily Arizona Silver Belt," and that the paper circulated generally throughout the state, and more especially in Gila county and in the town of Miami and city of Globe, Globe being the county seat where the courthouse in which the court is held is situated; that Cleve W. Van Dyke is the owner of all the capital stock of said company, and exercises full and absolute control and management of said newspaper; that respondent Scott at all said times was the editor of said newspaper.

On May 9th, while the cause was pending, there was published in said newspaper an article entitled "New Uses of Government by Injunction"; on May

10th, an article entitled " 'Cootie' Officials for Miami Would be Like Putting Enemy Soldiers on Picket Duty for a Sleeping Army"; on May 12th, before the signing of the judgment and the denial of the motion for new trial, two articles, entitled as follows: "Court Wants Names of Kelley, Schatzkey, Light and Owen on Ballot, Van Dyke, Turner and Quinleven Off," and "Stand Firm! There must be No Intellectual Bisbee Deportation of Miami Democracy at the Hands of the Copper Companies"; on May 13th an article entitled "Void or Valid," and another "Retrogressional."

The facts we have just summarized are set forth in an affidavit of said Elledge filed in said court, and entitled "In the Matter of the Proceedings against Cleve W. Van Dyke, Walter J. Scott and the Southern Arizona Publishing Company, a Corporation, for Contempt of Court," and the affidavit concludes as follows:

"That each and all of said articles were published of and concerning this court and the judges thereof, and of and concerning said cause No. 4185–B (the docket number of the above-entitled case in the superior court of Gila county), and of and concerning the parties thereto and their attorneys; that the publication of said articles in said newspaper as aforesaid was calculated, and was intended by the said Cleve W. Van Dyke, the said Walter J. Scott, and the said the Southern Arizona Publishing Company, to hinder, obstruct, embarrass, and prevent the due administration of justice in said cause; that in procuring and causing said articles to be published and in consenting to, conniving at, and approving the publication of said articles in said newspaper, as aforesaid, the said Cleve W. Van Dyke, the said Walter J. Scott and the said the Southern Arizona Publishing Company, and each of them, have been and are guilty of a contempt of this court; and that this affiant now moves and prays this court to issue its order requiring the said Cleve W. Van Dyke, the

said Walter J. Scott, and the said the Southern
Arizona Publishing Company, and each of them, to
show cause upon a day certain why they and each of
them should not be punished for said contempt.''

Upon the filing of this affidavit, which set forth
the publications mentioned, appended thereto *in haec
verba* as exhibits, the court on June 7th issued an
order directed to the alleged contemnors, Van Dyke,
Scott and the Southern Arizona Publishing Com-
pany, which required them to appear before the court
on June 9th, then and there to show cause why they,
and each of them, should not be punished for con-
tempt. The order was thereupon served upon the
relator company and Scott, and later upon Van Dyke.
In answer to the order to show cause the re-
lators Scott and the company presented and filed
their objections to the jurisdiction of the court to
hear or determine the contempt proceedings, together
with affidavits to the effect that they could not have
a fair and impartial trial of said matter before the
said J. E. CROSBY as acting judge, because of the
bias and prejudice of the said CROSBY against said
relators. The judge nevertheless disregarded the dis-
qualifying affidavit, and proceeded to hear the objec-
tion to the jurisdiction of the court, and overruled
such objection. There was then filed a motion to
dismiss, upon grounds which so far as important
will be adverted to later in the course of this opinion.
This motion was likewise denied. Thereupon coun-
sel for said respondents announced their desire to
enter a plea of not guilty, but, as is alleged in the
petition for the writ, Judge CROSBY refused to
permit such plea to be entered, and—

''compelled said respondents, over their objections,
to prepare and file their answer, verified by oath, to
the said accusation contained in said affidavit of said
Elledge, which said verified answer was presented

and filed under protest of both of said relators that the same was compelling them, and each of them, to be witnesses against themselves in a criminal prosecution."

The next step was a demand for a jury trial. This demand was denied, and the court proceeded to a determination of the issues made by the affidavit and verified answer, and upon the conclusion of such hearing found the relators Scott and the Southern Arizona Publishing Company guilty of contempt of court as alleged in the affidavit of Elledge, and fixed the tenth day of July, 1922, as the time for passing sentence.

In answer to the order to show cause the relator Van Dyke filed the same objection to the jurisdiction of the court, with like affidavit and motion, as did the other relators, with the exception that he had not filed his answer to the proceedings, and the hearing on his pleas had not taken place, nor had rulings been made by the court in his case at the time this writ was applied for and the alternative order made. It is alleged, however, that the court is prepared to, and will, deal with him as it has dealt with the other relators.

Before the time arrived to pronounce judgment upon relators Scott and the Southern Arizona Publishing Company, the petition for writ of prohibition was filed in this court, and all further proceedings, including the imposition of sentence against the relators adjudged guilty of contempt, were stayed by our order. The question for determination is whether the alternative writ of prohibition should be quashed, or made absolute.

Spelling, in his work "Injunctions and Other Extraordinary Remedies," second edition, section 1716, defines the writ of prohibition to be:

"That process by which a superior court prevents an inferior court or tribunal from usurping or exercising a jurisdiction with which it has not been vested by law. It is an extraordinary writ, because it only issues when the party seeking it is without other adequate means of redress for the wrong about to be inflicted by the act of the inferior tribunal. The writ was well known to the common law, being frequently resorted to to prevent usurpations of jurisdiction (by inferior tribunals) and to keep them within the jurisdictional limits prescribed for them by law. But the writ of prohibition lies only when the inferior court proposes to exceed its lawful jurisdiction as to the person or the subject-matter, or in the enforcement of its rulings in a manner or by means not intrusted to its judgment or discretion."

See, also, 22 R. C. L. 19, and cases cited.

This court held in *Crowned King Mng. Co.* v. *District Court,* 7 Ariz. 263, 64 Pac. 439, quoting the language of the Supreme Court of the United States in the case of *In re Rice,* 155 U. S. 402, 39 L. Ed. 201, 15 Sup. Ct. Rep. 152:

"Where it appears that a court whose action is sought to be prohibited has clearly no jurisdiction of the cause originally, or of some collateral matter arising therein, a party who has objected to the jurisdiction at the outset, and has no other remedy, is entitled to a writ of prohibition as a matter of right. But where there is another legal remedy by appeal or otherwise, or where the question of the jurisdiction of the court is doubtful, or depends on facts which are not made matter of record, or where the application is made by a stranger, the granting or refusal of the writ is discretionary."

See, also, *Johnson* v. *Betts,* 21 Ariz. 365, 188 Pac. 271.

Complementary to these rules the law is:

"That a writ of prohibition may not ordinarily be used as a process for the review and correction of errors committed by inferior tribunals. Mere

error, irregularity, or mistake in the proceedings of a court having jurisdiction does not justify a resort to the extraordinary remedy by prohibition, both because there has been no usurpation or abuse of power, and because there exist other adequate remedies." 22 R. C. L. 23.

See *Silver Peak Mines* v. *Second Judicial Dist. Court,* 33 Nev. 97, Ann. Cas. 1913D, 587, and authorities cited in note, 110 Pac. 503; *Sperry* v. *Sanders,* 50 W. Va. 70, 40 S. E. 327; *Fleshman* v. *McWhorter,* 54 W. Va. 161, 46 S. E. 116; *Powhatan Coal & Coke Co.* v. *Ritz,* 60 W. Va. 395, 9 L. R. A. (N. S.) 1225, 56 S. E. 257.

Such being the nature and extent of our jurisdiction in this proceeding, we next inquire whether any of the publications can be said to have been contemptuous, and as preliminary to such discussion we summarize and quote from certain of the articles.

The article of May 9th, entitled "New Uses of Government by Injunction," begins:

"A new interpretation is being attempted in the use of the court power of injunction by the 'hard boiled' mercenary politicians who have been sent in to 'carpet bag' Miami.

"During strikes the power of injunction has been twisted from the protection of property rights until it has been successfully turned into 'Government by Injunction.' However, it remained to the Absentee Capitalistic forces to go a step farther in the application of this judicial power which ought rarely to be invoked. These forces, through their 'cootie' affidavit men, and their 'cootie' lawyers have asked the judiciary to restrain the democracy of Miami from placing a ticket upon the ballot to be used at the town election, May 22."

The article then goes on to charge that the "absentee capitalistic" forces concocted a scheme to keep the people of Miami from voting the Democratic ticket and from placing the name of a Democrat on

the ballot, all in pursuance of a design to take over the power of government in Miami; and recites the steps taken to effectuate such scheme, amongst others the following:

"Back door slanderers were employed to circulate this propaganda all over town. Other stories, conceded in a public speech made by their 'cootie' attorney, to be criminal libel, were circulated."

"Their whole campaign has been organized, financed and propagandized with this political maneuver in view. With one grand swoop they expected to march into the superior court, secure an injunction and win the election because they would have no opposition."

"As one of the 'cooties' remarked, a whole week before the injunction was even to be decided, and nearly two weeks before election day, 'next Wednesday we will celebrate the victory of our ticket.'"

"Imagine Miami and its improvement program, its prosperity and its $240,000 in cash, turned over to a 'cootie' administration, capable of figuring out a complete criminal program of this sort."

"This whole imported crowd of colonized 'cooties' combined has not the intelligence, even in gutter snipe tactics, to win anything that is really contested."

"Their efforts will be rewarded with the shame that is always the reward of cowardice and crime and their defeat will show condemnation on the part of all good citizens of Miami."

The next articles, being those entitled " 'Cootie' Officials for Miami Would be Like Putting Enemy Soldiers on Picket Duty for a Sleeping Army," and "Court Wants Names of Kelley, Schatzkey, Light and Owen on Ballot, Van Dyke, Turner and Quinleven off," do not appear to be contemptuous. The first article treats of the political aspects of the local situation. While extravagant in language and profluent in epithet, it does not refer to the pending cause and we must presume it to have been justified

as an expression of opinion on the issues of the political campaign then in progress. Certainly so, if we take for granted—which we think we should without further showing—that relators believed the interests of the community would be best served by electing the candidates they were supporting. Whatever other responsibility the relators might be under for the publication of this article, we think it cannot be deemed contemptuous. The second article purports to be an account of what occurred in the courtroom when the decision of the case was announced by Judge CROSBY. Aside from one or two expressions as to the judge's demeanor and utterances, it seems to be entirely unexceptionable, and for aught we know is a fair and truthful account of actual happenings. In any event, it is not charged to be an untruthful or unfair statement of such occurrences.

The next article, published on May 12th, is entitled "Stand Firm! There must be No Intellectual Bisbee Deportation of Miami Democracy at the Hands of the Copper Companies," in which the following occurs:

"It was no accident which placed on the bench in a neighboring and rival city in an atmosphere often unfriendly to Miami, a superior court judge who no matter what his charming qualities may have been otherwise, appears to have understood and sympathized with the growth and development of the democratic forces of Miami about as much as the average cattle man understands and sympathizes with the average mucker or miner.

"It was no accident which caused that judge to summon another judge from the agricultural regions of the north who no matter how much he might at times appear to be grasping for the truth, the Ariadne clew out of this maze of copper company tainted falsehoods, at other times appeared to have been unable to grasp the fundamental fact that behind all and above all, as light shines above darkness,

could be seen the wonderful story, the marvelous story, the story without a parallel in the history of the world of a great people of a great town seeking to free themselves from copper company domination and dictation.

"It was no accident which put into this case a criminal lawyer who used all of his knowledge and skill and cunning gained by close contact with criminals to attempt to hector, brow beat and badger witnesses who were trying to tell the truth, in a political case, the whole truth and nothing but the truth.

"It was no accident which caused this particular lawyer to write a petition so tainted with falsehoods that the last words on his lips as the curtain rang down on the scene yesterday afternoon were apologies to the court for his client, Elledge, having sworn that AFTER that meeting on the night of March 6 that the members of the council went out and secured signatures on their nominating petitions.

"It was no accident which caused a good Christian girl, a pupil in the Miami high school, acting as a stenographer for Attorney Senner to be placed in a position where she was able to show how an attempt had been made by two of the witnesses for the plaintiff to destroy the character of Town Attorney Senner; it was no accident that this girl was able to prove that the testimony to the effect that one of the witnesses for the defense had closed the door and stood against the door with the idea of securing secrecy was absolutely false. . . .

"But not one scintilla of evidence has been produced in the present hearing of the case of Elledge vs. the officials of the Town of Miami to prove fraud for the reason that no fraud has been committed."

We consider later the publications of May 13th entitled "Void or Valid" and "Retrogressional."

In *State* v. *Galloway & Rhea,* 5 Cold. (Tenn.) 325, 98 Am. Dec. 404, at page 416, the court quotes with approval the following language from *State* v. *Frew,* 24 W. Va. 416, 49 Am. Rep. 257:

"Courts, therefore, look with great disfavor upon the publication of pending proceedings; and there is abundant authority to support the proposition that the publication in a newspaper of an article commenting upon proceedings in court then pending and undetermined, or reflecting upon the court, the jury, the parties, or the officers of the court, with reference to the suit, in such a way as to influence the decision of the controversy, by prejudicing the public mind with respect to the parties to the cause or the merits thereof, or to otherwise impede, embarrass, obstruct, or corrupt the administration of justice, and with that obvious purpose, is a contempt of court, and punishable by attachment."

See, also, *State* v. *Tugwell,* 19 Wash. 238, 43 L. R. A. 717, 52 Pac. 1056; *State* v. *Kaiser,* 20 Or. 50, 8 L. R. A. 584, 23 Pac. 964; *People* v. *Wilson,* 64 Ill. 221, 16 Am. Rep. 528; *State* v. *Frew, supra; Hughes* v. *Territory,* 10 Ariz. 119, 6 L. R. A. (N. S.) 573, 85 Pac. 1059; *Meyers* v. *State,* 46 Ohio St. 473, 15 Am. St. Rep. 638, 22 N. E. 43; *Tate* v. *State,* 132 Tenn. 131, 177 S. W. 69; *Patterson* v. *Colorado,* 205 U. S. 454, 10 Ann. Cas. 689, 51 L. Ed. 879, 27 Sup. Ct. Rep. 556 (see, also, Rose's U. S. Notes); 6 R. C. L. 509, and cases cited.

Publications of this character are classified as criminal contempts, being acts which obstruct the administration of justice or tend to bring the court into disrepute, as distinguished from civil contempts, which consist in failing to do something which the contemnor is ordered by the court to do for the benefit or advantage of another party to the proceeding before the court. *Wyatt* v. *People,* 17 Colo. 252, 28 Pac. 961, loc. cit. 963; *People* v. *News-Times Publishing Co.,* 35 Colo. 253, 84 Pac. 912; *Bessette* v. *Conkey Co.,* 194 U. S. 324, 48 L. Ed. 997, 24 Sup. Ct. Rep. 665 (see, also, Rose's U. S. Notes).

The decided weight of authority and reason support the rule that the affidavit or information, or other accusatory paper, upon which the proceedings are founded, shall state facts which, if established, constitute the offense, and if the charge is not sufficient in such respect the court is without jurisdiction to proceed. 13 C. J. 65, cases cited; *Wyatt* v. *People, supra.* Though this be true, it is also the rule, at least in the absence of statutory requirement, that the accusation need not be as direct, specific and certain as is required by law in indictments or informations for criminal offenses. *State* v. *District Court,* 113 Minn. 304, 129 N. W. 583.

In *Schwartz* v. *United States,* 217 Fed. 866, 133 C. C. A. 576, it is said:

"There is no fixed formula for contempt proceedings, and technical accuracy is not required. It is sufficient if the offense is set out, so that the defendant is clearly informed of the charges against him and whether a criminal or civil contempt is alleged; and this is to be determined by examination of the entire record"—citing cases.

See *Hughes* v. *Territory, supra; Meyers* v. *State, supra.*

Relators devote a considerable portion of their briefs to an argument that some innuendo was required to show the contemptuous character of the publications, because they were not contemptuous *per se.* But it is alleged in the affidavit that each and all of said articles were published of and concerning the superior court of Gila county and the judges thereof, and of and concerning the injunction cause and the parties thereto and their attorneys, and that such publications were calculated and intended by relators to hinder, obstruct, embarrass and prevent the due administration of justice in said cause. Under these allegations and the rule that the mean-

ing and intent of the publications are to be determined by a fair interpretation of the language used and its manifest purpose and effect (*In re Fite,* 11 Ga. App. 665, 76 S. E. 397), we think the articles from which we have quoted are to be considered contemptuous. That they were published for the purpose of interfering with the administration of justice in the cause then pending before the superior court of Gila county is very plain. Beyond the peradventure of a doubt the authors of these articles intended thereby to arouse public sentiment and influence the general opinion of the people of Miami and vicinity in favor of the case of the defendants then pending before the court, and to wrest from the judge a decision favorable to the defendants, whatever his views might be. To accomplish this object, the merits of the case, the selfish motives and purposes animating those who instituted and prosecuted it, the evil consequences of a decision unfavorable to the defendants, the alleged unprofessional and unethical character and conduct of the attorney for the plaintiff, the credibility of the witnesses for the plaintiff and of the plaintiff himself, the sufficiency of the evidence produced to substantiate certain allegations of the complaint, the impartiality and honesty of the judge who tried the case and that of his predecessor on the bench, were each and all commented upon in a manner to persuade belief in the conclusion that the case for the plaintiff was without merit, and that the proceedings were an attempt under forms of law to take over, from those who should be legally entitled thereto, the power of government in the town of Miami.

The language used in the case of *People* v. *Wilson, supra,* is apt:

"A court will, of course, endeavor to remain wholly uninfluenced by publications like that under con-

sideration, but will the community believe that it is able to do so? Can it even be certain in regard to itself? Can men always be sure of their mental poise? A timid man might be influenced to yield, while a combative man would be driven in the opposite direction. Whether the actual influence is on one side or the other, so far as it is felt at all, it becomes dangerous to the administration of justice. Even if a court is happily composed of judges of such firm and equal temper that they remain wholly uninfluenced in either direction, nevertheless a disturbing element has been thrown into the council chamber, which it is the wise policy of the law to exclude. Regard it in whatever light we may, we cannot but consider the article . . . *as calculated* to embarrass the administration of justice, whether it has in fact done so or not, and, therefore, as falling directly within the definition of punishable contempts.''

See *State* v. *Tugwell, supra; State* v. *Kaiser, supra.*

Objection is made to the proceedings because the affidavit was not entitled, nor the proceedings had, in the name of the state of Arizona. The title is precisely in the form suggested in *Hughes* v. *Territory, supra,* for a similar proceeding. There is nothing to the point that the proceeding is a prosecution within the meaning of article 6, section 20, of the Constitution, which requires, *inter alia,* that ''all prosecutions shall be conducted in the name of the State of Arizona and by its authority.'' The prosecutions referred to in that section are of offenses required to be prosecuted by indictment or information. The legislature would seem to have thus construed it in various enactments. See, especially, section 751, Penal Code. We are convinced that no broader meaning should be given the language.

Nor is there anything to the point that the affidavit is insufficient because the published articles

were attached thereto merely as exhibits. This contention is rested upon the authority of the cases of *McPherson* v. *Hattich,* 10 Ariz. 104, 85 Pac. 731, and *State* v. *Superior Court,* 14 Ariz. 126, 125 Pac. 707, in which it is held that the absence from a complaint of an allegation necessary to the plaintiff's cause of action cannot be supplied by a statement in an exhibit filed with and made a part of such complaint. The affidavit in this proceeding, however, is not lacking in the respect of any substantial averment. It contains the direct allegation that the publications in question had been actually made, and the only ground of criticism is that, instead of setting forth such publications in the body of the affidavit, they are attached thereto and made a part thereof as exhibits *in haec verba.* We see no possible objection to this method of setting forth the facts. It may be commended, indeed, for obvious reasons of convenience of reference and perusal.

It is contended that Judge CROSBY was deprived of jurisdiction by the filing of the affidavits charging him with bias and prejudice, in accordance with paragraph 500 of the Civil Code, as amended by chapter 107, Session Laws of 1921, and section 999 of the Penal Code. Paragraph 500 of the Civil Code provides:

"If either party to a civil action brought in any superior court shall file an affidavit alleging either: . . .

"(4) That the affiant has cause to believe and does believe that on account of the bias or prejudice or interest of said judge he cannot obtain a fair and impartial trial.

"It shall be the duty of said judge to at once request the judge of the superior court of some other county to hold the superior court in the county where such action is pending, and to preside at the trial of such action, and to hear all matters involved therein."

The affidavits to disqualify were made· in conformity with the requirements of this paragraph, with the addition that, following the provisions of section 999 of the Penal Code, which reads:

"A criminal action may be removed from the court in which it is pending, on the application of the defendant, on the ground that a fair and impartial trial cannot be had in the county where the action is pending, and if the defendant shall make affidavit, supported by the affidavits of three resident electors of the county that he cannot have a fair and impartial trial because of the bias and prejudice of the superior judge of the county wherein such cause is pending, the judge shall call in some other superior judge of the state to preside at such trial,"

there were also filed the affidavits of three resident electors of the county that the relators could not have a fair and impartial trial because of the bias and prejudice of Judge CROSBY.

The question therefore arises whether this proceeding in contempt is either a civil or criminal action within the meaning of these Code provisions, The idea that this proceeding is in any sense a civil action may be at once dismissed. It is no less certain that it is not a criminal action which is to be prosecuted by indictment or information as provided by our Constitution and Penal Code (Const., art. 2; Pen. Code, § 750). It is perhaps not unwarranted to say that virtually all the authorities which announce any express holding as to the nature of a proceeding to punish for criminal contempt go upon the assumption that such a proceeding is *sui generis,* being the exercise of the inherent power of courts to free themselves from influences calculated or tending to obstruct, embarrass or corrupt the administration of justice. Hence in the application of these general principles to the specific cases of applications to secure changes of venue, or to disqualify the presid-

ing judge, the rule is deduced that, unless the statute contain language broad enough in meaning to include a proceeding instituted to punish for contempt, the change of judge or venue cannot be made, and that the language "criminal action" or "civil action" is not to be interpreted as embracing a contempt proceeding.

*Lamonte* v. *Ward,* 36 Wis. 558, cited by relators, arose under a statute which provided for the removal or change of venue of any cause or matter, and it was said that if the contempt proceeding was not a "cause" it was at least a "matter" within the meaning of the statute, and was therefore removable.

*State* v. *Superior Court,* 77 Wash. 631, 138 Pac. 291, was a prosecution upon information for a constructive contempt. The statutory language being that a change of venue should be granted in "any action or proceeding," it was held (citing *Lamonte* v. *Ward, supra*), that such prosecution was a "proceeding" within the contemplation of the statute. But under statutory provisions similar to our own we find no authority holding that the proceeding here is to be regarded as either a civil or a criminal action.

In *State* v. *Clancy,* 30 Mont. 193, 76 Pac. 10, it was held under a statute which provided that the district judge should be disqualified to hear or determine any action or proceeding before him when either party made and filed an affidavit that he had reason to believe, and did believe, that he could not have a fair and impartial hearing or trial, by reason of the bias or prejudice of the judge, that a contempt proceeding is not a civil action, but is a proceeding *sui generis,* and the statute was therefore held inapplicable.

In *People* v. *Williams,* 51 App. Div. 102, 64 N. Y. Supp. 457, the relator was charged with criminal contempt for disorderly conduct in the presence of the court at the trial. He was arrested upon a

charge of criminal contempt, and, refusing to plead, filed an affidavit that the magistrate was a witness for him and asked for transfer of the case under a section of the Code of Civil Procedure. It was held that the proceeding was not a criminal action and was not instituted for the punishment of a crime, although criminal in its nature, and that the change of venue asked for could not be granted because the case could not be tried before another justice.

*State* v. *Newton,* 62 Ind. 517, was attachment for contempt for refusal to appear in response to a subpoena. It was held that the proceeding was neither a civil action nor a state prosecution, and that the proceeding was *sui generis* and authorized by the statute, not for the punishment of crimes or misdemeanors, or the preservation of the peace, or the protection of the citizen from injury by violence as in a state prosecution, but that it was authorized as a shield and protection to the dignity and good order of the courts of justice, and to enable them to discharge without hindrance or unnecessary obstruction the public duties which they were required by law to perform.

In *Noble Tp.* v. *Aasen,* 10 N. D. 264, 86 N. W. 742, it was held that the sections of the Code relied upon by the defendant had reference either to a civil or criminal action proper, and that the proceeding was neither the one nor the other. It was said:

"If the proceeding is to be regarded as a means of punishing a criminal contempt of court, it must be classed as a summary proceeding of a *quasi*-criminal character, and hence not a criminal action."

In *Re Brown,* 168 N. C. 417, 84 S. E. 690, the court after referring to the principle that the power to punish for contempt is inherent in any court administering justice as a governmental function (citing 9 Cyc. 35, with approval) said that "ordinarily a change

of venue is not allowed in proceedings of this character." See, also, *Bloom* v. *People,* 23 Colo. 416, 48 Pac. 519.

These authorities establish that a proceeding to punish for contempt is neither a criminal nor civil action within the meaning of these terms as used in statutes allowing changes of venue, or the disqualification of the presiding judge.

The grounds of disqualification set forth in the affidavits, following the provisions of the Penal Code, state no facts from which it would appear that Judge CROSBY was actually biased or prejudiced against the relators, and must therefore necessarily be taken as a mere expression of opinion by the affiants that such bias or prejudice existed. In the language of Chief Justice RYAN, in *Vogel* v. *Milwaukee,* 47 Wis. 435, 2 N. W. 543, quoted with approval in *Stephens* v. *Stephens,* 17 Ariz. 306, 152 Pac. 164, such an affidavit does not call for a change of venue or judge upon the fact of a judge's prejudice, but merely upon the imputation of it.

"It goes upon a statement of belief, not of fact, save in so far as belief may be a fact; upon assertion that the party has reason to believe and does believe that he cannot receive a fair trial on account of the judge's prejudice, not upon averment of the prejudice itself." (Citing cases.)

In this view, unquestionably the correct one, there is added reason for holding that the liberal terms of our statutes should not be extended to include cases that are not embraced in the language used. We therefore hold that the judge's refusal to recuse himself did not deprive the court of jurisdiction.

The next contention challenges the jurisdiction of the court because of its refusal to accord relators a trial by jury, upon their demand therefor. The argument that such right exists is founded upon the pro-

visions of title 6, part 14, chapter 6, being paragraphs 1798 to 1804 of the Civil Code of 1913. This chapter was taken from the Clayton Act passed by Congress October 15, 1914 (chapter 323, 38 Stats. 738 to 740, being sections 21 to 25 of said act [6 Fed. Stats. Ann., pp. 140–143; U. S. Comp. Stats., §§ 1245a–1245e]), which sections as modified to apply to our local conditions were enacted as the chapter of our laws referred to.

Paragraph 1798 reads as follows:

"Any person who shall willfully disobey any lawful writ, process, order, rule, decree, or command of any superior court of this state by doing any act or thing therein or thereby forbidden to be done by him; if the act or thing so done by him be of such character as to constitute also a criminal offense under any statute of this state, shall be proceeded against for his said contempt as hereinafter provided."

Paragraphs 1799 to 1802, inclusive, set forth the procedure to punish the contempts defined by paragraph 1798. Paragraphs 1800 and 1803, respectively, read as follows:

"In all cases within the purview of this act such trial may be by the court, or upon demand of the accused, by a jury; in which latter event the court may empanel a jury from the jurors then in attendance, or the court or the judge thereof in chambers may cause a sufficient number of jurors to be selected and summoned, as provided by law, to attend at the time and place of trial, at which time a jury shall be selected and empaneled as upon a trial for misdemeanor; and such trial shall conform as near as may be, to the practice in criminal cases, prosecuted by indictment or upon information."

"Nothing herein contained shall be construed to relate to contempts committed in the presence of the court, or so near thereto as to obstruct the administration of justice, nor to contempts committed in disobedience of any lawful writ, process, order, rule,

decree, or command, entered in any suit or action brought or prosecuted in the name of or on behalf of the state of Arizona, but the same and all other cases of contempt not specifically embraced within section 1 of this act (Par. 1798) may be punished in conformity to the usages now prevailing.''

It will be seen that paragraph 1798, defining the contempts which are to be punished as provided in the chapter, includes therein only the disobedience of any lawful writ, process, order, rule, decree or command of any superior court of·this state, and requires in addition that the act or thing so done by the contemnor be of such character as to constitute also a criminal offense under some statute of this state.· One contention of relators is that because paragraph 1800 provides that ''in all cases within the purview of this act'' the accused shall upon demand be entitled to a jury trial, the paragraph is to be construed as conferring the right to such trial by the contemnors mentioned in paragraph 1803, that is to say, that the words quoted mean, in the language of counsel, ''the whole extent'' of the act. We see no merit whatever in this contention, nor in the correlated claim that because paragraph 1803 allows the contempts therein mentioned to be ''punished'' in conformity to the usages now prevailing the prosecution must be instituted or the trial thereof had—as distinguished from its *punishment*—in accordance with the provisions of the chapter. If paragraph 1803 had been omitted from the act it would follow, upon relators' own theory, that these contentions could not be maintained. But the legislature went further and *ex industria* excluded from the purview of the act the contempts mentioned in paragraph 1803, by enacting the provisions of that paragraph. It is not to be supposed therefore that in the very

process of doing so the intent was manifested to bring the excluded class within such purview.

( Paragraph 1803 is specific in its provisions that the contemptuous acts therein mentioned, "and all other cases of contempt not specifically embraced within section 1 of this act (par. 1798) may be punished in conformity to the usages now prevailing." It is therefore unnecessary to determine whether the power to punish the contempts in hand is referable to the language "contempts committed in the presence of the court, *or so near thereto as to obstruct the administration of justice*," which language italicized has been held to apply to newspaper publications calculated to embarrass, impede, or obstruct the administration of justice (see *Toledo Newspaper Co.* v. *United States,* 247 U. S. 402, 62 L. Ed. 1186, 38 Sup. Ct. Rep. 560; Id., 237 Fed. 986, 150 C. C. A. 636; Id. (D. C.), 220 Fed. 458; *In re Independent Publishing Co.,* 240 Fed. 849, Ann. Cas. 1917C, 1084, L. R. A. 1917E, 703, 153 C. C. A. 535; *Patterson* v. *Colorado,* 205 U. S. 454, 10 Ann. Cas. 689, 51 L. Ed. 879, 27 Sup. Ct. Rep. 556 (see, also, Rose's U. S. Notes); *United States* v. *Providence Tribune Co.* (D. C.), 241 Fed. 524; *Myers* v. *State,* 46 Ohio St. 473, 15 Am. St. Rep. 638, 22 N. E. 43; *State* v. *Frew,* 24 W. Va. 416, 49 Am. Rep. 257; *Tate* v. *State,* 132 Tenn. 131, 177 S. W. 69; *People* v. *Wilson,* 64 Ill. 195, 16 Am. Rep. 528), or is to be referred to the power exercised by courts independently of any express statutory provision as essential to their own preservation as agencies of government.

The following propositions are well established by authority: (1) That newspaper publications may amount to contempts of court, and particularly that publications pending a suit reflecting on the court, the jury, counsel, parties, or witnesses, or commenting on the case, and the weight and credibility of the

testimony adduced or to be adduced therein, which articles are calculated to influence or embarrass the action of the tribunal before which the case is pending, in deciding the case on its merits, must be considered as contempts of that court because they obstruct the administration of justice therein; (2) that the power to punish for such contempts may be exercised summarily by attachment; (3) that such proceedings are to be prosecuted before the court in which the contempt was committed, and before that court alone; (4) that such contempts may be punished after a hearing before the court contemned without the intervention of a jury. See the following authorities: *In re Debs,* 158 U. S. 564, 39 L. Ed. 1092, 15 Sup. Ct. Rep. 900 (see, also, Rose's U. S. Notes); *Hughes* v. *Territory, supra; State* v. *Sims,* 17 Ariz. 410, 153 Pac. 451; *Clark* v. *People,* Breese, 340, 12 Am. Dec. 177; *McDougall* v. *Sheridan,* 23 Idaho, 191, 128 Pac. 954; *State* v. *Newton,* 62 Ind. 517; *Fishback* v. *State,* 131 Ind. 304, 30 N. E. 1088; *People* v. *Wilson,* 64 Ill. 195, 16 Am. Rep. 528; *In re Dingley,* 182 Mich. 44, 148 N. W. 218; *In re Chadwick,* 109 Mich. 588, 67 N. W. 1071; *Globe Newspaper Co.* v. *Commonwealth,* 188 Mass. 449, 3 Ann. Cas. 761, 74 N. E. 682; *Re Hart,* 104 Minn. 88, 15 Ann. Cas. 197, 17 L. R. A. (N. S.) 585, 116 N. W. 212; *State* v. *Shepherd,* 177 Mo. 205, 99 Am. St. Rep. 624, 76 S. W. 79; *Back* v. *State,* 75 Neb. 603, 106 N. W. 787; *People* v. *Williams,* 51 App. Div. 102, 64 N. Y. Supp. 457; *In re Deaton,* 105 N. C. 59, 11 S. E. 244; *In re Brown,* 168 N. C. 417, 84 S. E. 690; *Myers* v. *State,* 46 Ohio St. 473, 15 Am. St. Rep. 638, 22 N. E. 43; *Burke* v. *Territory,* 2 Okl. 499, 37 Pac. 829; *State* v. *Kaiser,* 20 Or. 50, 8 L. R. A. 584, 23 Pac. 964; *State* v. *Tugwell,* 19 Wash. 238, 43 L. R. A. 717, 52 Pac. 1056; *State* v. *Circuit Court,* 97 Wis. 1, 65 Am. St. Rep. 90, 38 L. R. A. 554, 72 N. W. 193; *Commonwealth* v.

*Dandridge,* 2 Va. Cas. 408; *State* v. *Frew,* 24 W. Va. 416, 49 Am. Rep. 257; *Tate* v. *State,* 132 Tenn. 131, 177 S. W. 69; 6 R. C. L. 509.

The statutory language is that such contempts "may be punished in conformity to the usages now prevailing" (paragraph 1803); that is, the usages prevailing at the time of the adoption of the act in 1913. This phraseology refers to such common-law usages as are consistent with and adapted to the necessities of our people, and which are not repugnant to nor inconsistent with the Constitution of the United States or the Constitution or laws of this state, or the established customs of the people thereof. Paragraph 5555, Civ. Code 1913. If we would ascertain our own laws and usages at the time of the adoption of the act in question, there being no authoritative precedent in this jurisdiction, we must necessarily investigate the then prevailing usages in states having the common law as the basis of their jurisprudence, from which we may deduce our own rules of decision. Such usages prevailed here in the sense that they were implicit in the common law itself. This principle is too familiar to need elaboration (see *Lux* v. *Haggin,* 69 Cal. 255, 4 Pac. 919, 10 Pac. 674, loc. cit. 750), and the subject is adverted to only because of the suggestion of counsel for relators that because the questions in this case concerning the right to a trial by jury have never been decided here since statehood that we should' lay down a rule concerning constructive contempts "which will be in accordance with American Principles of justice, unhampered by any previous decisions." We hold that the court was within its jurisdiction in trying the contempts charged without a jury.

It is alleged in the petition for the writ that the superior court refused to accept from relators Scott and the Southern Arizona Publishing Company pleas

of not guilty to the affidavit in contempt, and will refuse to accept a like plea from the relator Van Dyke upon his appearance to show cause why he should not be punished for contempt, and compelled said relators, and will compel the relator Van Dyke, to prepare and file answers under oath to the said accusations, and that therefore the court is without jurisdiction. The argument in support of this contention is for the most part based upon the assumption that the contempt proceeding is a criminal prosecution and governed by the provisions of the Penal Code relative to criminal offenses. That phase of the case has been sufficiently treated, and we shall not go over that ground again.

So far as the relators may be accused by the affidavit of having committed a criminal offense, as to which we intimate no opinion, we have no doubt the court should not require a verified answer thereto. To the extent that the relators in making a full answer might be required to place of record admissions. or statements tending to incriminate themselves, they would be justified in refusing to abide by the order of the court requiring such an answer. The jurisdiction of the court to enforce obedience to any such order is not, however, before us in this proceeding, as the relators whose hearings have proceeded to answer have complied with the order made. If any relator should conceive that his rights would be best protected by standing upon a plea of not guilty and refusing to answer the accusation further, it could not be said that the court would lose jurisdiction, should it accept and proceed to a determination of the issues made under such a plea to the affidavit. If, on the other hand, having fear of punishment for supposed contumacy before him, any relator responds by filing a sworn answer, as was done here by relators Scott and Southern Arizona Publishing Com-

pany, it is not apparent how obedience to the order of the court could deprive it of jurisdiction to act; nor that the order itself requiring such answer would be an unauthorized assumption of jurisdiction. The most that can be said is that such an order under certain circumstances might be erroneous. But as established by the cases already cited, *supra,* the writ of prohibition is not to be used ordinarily as a process for the review and correction of mere errors committed by an inferior tribunal.

The next contention is that the court exceeded its jurisdiction in refusing to accept the sworn answers of the relators Scott and the Southern Arizona Publishing Company as conclusive so as to fully purge the contempt charged. We think the court was not required so to do. The language of Justice HOLMES, speaking for the Supreme Court of the United States in the case of *United States* v. *Shipp,* 203 U. S. 563, 8 Ann. Cas. 265, 51 L. Ed. 319, 27 Sup. Ct. Rep. 165 (see, also, Rose's U. S. Notes), in answer to a contention that the sworn answers were conclusive so far as they averred that no contempt was intended, and that the acts charged never took place, is pertinent in this regard:

"It is urged that the sworn answers are conclusive, that if they are false the parties may be prosecuted for perjury, but that in this proceeding they are to be tried, if they so elect, simply by their oaths. It has been suggested that the court is a party and therefore leaves the fact to be decided by the defendant. But this is a mere afterthought to explain something not understood. The court is not a party. There is nothing that affects the judges in their own persons. Their concern is only that the law should be obeyed and enforced, and their interest is no other than that they represent in every case. On this occasion we shall not go into the history of the notion. It may be that it was an intrusion or perversion of the canon law, as is suggested by the propounding

of interrogatories and the very phrase, purgation by oath (*juramentum purgatorium*). If so, it is a fragment of a system of proof which does not prevail in theory or as a whole, and the reason why it has not disappeared perhaps may be found in the rarity with which contempts occur. It may be that even now, if the sole question were the intent of an ambiguous act, the proposition would apply.''

If as to any particular publication or part thereof which appears contemptuous, the intent of the act of publication shall be for any reason ambiguous and susceptible of innocent explanation, the determination of that fact, whether erroneously or correctly decided, is still within the jurisdiction of the court. See, generally, *Bloom* v. *People,* 23 Colo. 416, 48 Pac. 519, to the effect that whether jurisdiction attaches in the first place in a contempt proceeding is to be determined from an examination of the affidavit or information, and that after it has so attached it is not divested by proof that no contempt was committed.

On that question, however, it may not be improper to observe that whether the language is contemptuous is ordinarily ascertained by its manifest meaning and effect without regard to the intent with which it was used. So far as these articles are contemptuous in their necessary effect, and there is no ambiguity or obscurity of expression, it is difficult to perceive how one charged with their publication could justify his acts by avouching his innocent or respectful intent. The cases seem to rule that under such circumstances the absence of bad intent may possibly mitigate the punishment, but can never justify an unambiguous and unlawful utterance. See *State* v. *Howell,* 80 Conn. 668, 125 Am. St. Rep. 141, 13 Ann. Cas. 501, 69 Atl. 1057; *In re Fite,* 11 Ga. App. 665, 76 S. E. 397; *Territory* v. *Nugent,* 1 Mart.

(O. S.) (La.) 103, 5 Am. Dec. 702; *People* v. *Gilbert,*
281 Ill. 619, 118 N. E 196; *Territory* v. *Murray,* 7
Mont. 251, 15 Pac. 145.

We come next to the consideration of the question
as to the sufficiency of the affidavit so far as it is
founded upon the publications made subsequent to
the denial of the motion for new trial.   For all prac-
tical purposes, so far as this record shows, upon the
denial of the motion for a new trial the case was no
longer pending in the superior court of Gila county.
Many eminent courts have held under such circum-
stances that the criticism of a judicial officer, even
though made with respect to a cause which has ter-
minated, is a contempt which may be punished, and
the reasons for such rule are very strongly set forth
in these decisions, being especially the cases of *State*
v. *Morrill,* 16 Ark. 384; *Burdett* v. *Commonwealth,*
103 Va. 838, 106 Am. St. Rep. 916, 68 L. R. A. 251,
48 S. E. 878; *People* v. *Wilson,* 64 Ill. 195, 16 Am.
Rep. 528; *State* v. *Shepherd,* 177 Mo. 205, 99 Am. St.
Rep. 624, 76 S. W. 79; *In re Chadwick,* 109 Mich. 588,
67 N. W. 1071; *Commonwealth* v. *Dandridge,* 2 Va.
Cas. 408.   On the other hand, the decided weight of
authority is to the effect that defamatory comments
on the past conduct of a judge, though libelous, do
not constitute a contempt, even though they may well
embarrass the court to some extent in other and pend-
ing litigations.   See 6 R. C. L. 512.   And see cases
collected in notes to *Burdett* v. *Commonwealth, supra,*
in 68 L. R. A. 251.   In *State* v. *Sweetland,* 3 S. D.
503, 54 N. W. 415, it is said that the power to punish
for contemptuous matter in a newspaper publication
during the pendency of a cause—

"is not to enable a judge, who deems himself ag-
grieved, to punish the supposed wrongdoer to gratify
his own personal feelings, but to vindicate the dig-
nity and independence of the court, and to protect

himself, and those necessarily connected with it, while a matter is pending before it, from insolent and contemptuous abuse calculated to intimidate, influence, embarrass, or impede the court in the exercise of its judicial functions, or prevent a fair and impartial trial. If the judge was unjustly assailed by the article in question, he had the same, and only the same, remedies for the redress of the wrong which belong to all other citizens. After the conclusion of a trial the right of the press, without fear of punishment by contempt proceedings, in the interest of the public good, to challenge the conduct of the judge, parties, jurors or witnesses, and to arraign them at the bar of public opinion in connection with causes that have been fully determined, cannot be denied by a court in any other manner than by the ordinary proceedings in courts of justice. It would be a perversion of the salutary doctrines governing the proceedings of courts and its power to punish for contempts, to permit a judge to summon before him and punish by fine and imprisonment one who challenges his learning, integrity or impartiality as a judge in a public newspaper, except when the interests of the state demand it, to vindicate the independence and integrity of the courts, and to protect them from publications directly calculated to embarrass, impede, intimidate or influence, them in the due administration of justice in proceedings pending before them.''

This language meets with our approval, and we have no doubt expresses the proper rule under article 2, section 6, of our Constitution, which provides that—

''Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.''

On the record presented, we therefore hold that the publications made after the termination of the cause are not punishable as contempts of court.

Finally, it is to be decided whether relators are given any adequate remedy or means of redress,

besides the peremptory writ of prohibition prayed for herein, against the wrongs threatened to be done them in the imposition of punishment for the publication of the articles we have held to be noncontemptuous. Must they await the final action of the court in these proceedings, and be subjected to penalties which may extend to the imprisonment of relators Scott and Van Dyke before the law will take cognizance of the matter by some remedial process? Should this court defer action and refuse relief until after the wrongs have been done, the fine imposed, the imprisonment inflicted? We cannot be in doubt about the answer to these questions (see authorities, *infra*).

A consideration of the nature and scope of the remedial writs left to the relators as alternatives to a denial of the writ of prohibition would seem to render imperative the conclusion that to remit the petitioners to the other remedies afforded by law would be tantamount to a denial of justice, and that such remedies are inadequate, at least at this stage of the proceedings.

The case of *Hughes* v. *Territory, supra,* was considered by the court upon its merits, with an express reservation of the question of whether appeal would lie from a judgment determining one to be guilty of a criminal contempt. In *Ex parte Brown,* 3 Ariz. 411, it was held that the Supreme Court had no jurisdiction to review the act of the district court adjudging one guilty of contempt. This decision recognizes the common-law rule that every court of record is the exclusive judge of contempts committed against its authority and dignity, and, as a corollary, that no appeal lies from a judgment in such proceedings, in the absence of constitutional or statutory authority conferring the right. 13 C. J. 97.

Under statutes very similar to our own governing appeals, the Supreme Court of Minnesota, in the case of *State* v. *District Court,* 41 Minn. 42, 42 N. W. 598, has held that no appeal lies from an order adjudging one guilty of a criminal contempt, and that *certiorari* was an available remedy where the court had exceeded its jurisdiction.

The language of paragraph 1227 of our Civil Code of 1913, on the subject of appeals, does not confer the right of appeal from a judgment in a case of criminal contempt. The right is not therein expressly given, and the term "special proceedings" cannot be held to include such proceedings. This conclusion is strengthened by the terms of paragraph 1802, which provides for appeals from judgments convicting for the contempts embraced in the provisions of the chapter of which it is a part, being the modification of the Clayton Act above discussed.

Assuming, which we think is true, that either *certiorari* or *habeas corpus* would lie, it is apparent that the first-named writ, which ordinarily issues only when a court has consummated its action or judgment, is not at that time an adequate and efficacious remedy, and it is likewise apparent that any application for a writ of *habeas corpus* which does not show actual imprisonment must necessarily be denied. It is true that under the provisions of paragraph 1498 of our Civil Code the court which issues a writ of *certiorari* may require the inferior tribunal to desist from further proceedings; and it may be that *certiorari* would have been a proper remedy in this case at the time the alternative writ was applied for. Upon this question it is unnecessary to express any opinion. For, looking to the rights to be protected, we see no reason why we should be acute to find in the statutory terms conferring the right to *certiorari* an adequate remedy which will bar the peremptory

writ of prohibition, the alternative writ having is-
sued, nor why we should discharge the writ now
operative with the necessary effect of remitting the
relators to another proceeding which, so far as the
present record shows, must end in the same result.
Even on the assumption that we might have refused
the alternative writ of prohibition because of the
existence of another available remedy by *certiorari,*
it is now obv'ous that the stay of proceedings pro-
vided for by the statute governing the issuance of
*certiorari,* so far as effective, would be so as the
equivalent of the remedies given at the time of the
issuance herein of the alternative writ of prohibition.
We will not do justice in this matter by halves, nor
decide the difference which exists here between
tweedledum and tweedledee.

As to the inadequacy of the ordinary remedies by
appeal, *certiorari,* and *habeas corpus,* see, generally,
the following authorities: *State* v. *Circuit Court,* 97
Wis. 1, 65 Am. St. Rep. 90, 38 L. R. A. 554, 72 N. W.
193; *People* v. *Carrington,* 5 Utah, 531, 17 Pac. 735;
*State* v. *District Court,* 50 Mont. 289, Ann. Cas.
1917C, 164, 146 Pac. 743; *State* v. *Superior Court,* 67
Wash. 370, 121 Pac. 836. Compare *Arfsten* v. *Su-
perior Court,* 20 Cal. App. 269, 128 Pac. 949; *Ex
parte Hayter,* 16 Cal. App. 211, 116 Pac. 370; *Ter-
rill* v. *Superior Court,* 127 Cal. xviii, 60 Pac. 38;
*Ruggles* v. *Superior Court,* 103 Cal. 125, 37 Pac. 211;
*Gordon* v. *District Court,* 36 Nev. 1, 44 L. R. A.
(N. S.) 1078, 131 Pac. 134; *State* v. *Fort,* 107 Mo.
App. 328, 81 S. W. 476, loc. cit. 479.

We conclude that the writ of prohibition should
be made peremptory against any further action by
the court below, or the judge thereof, based upon the
publications which we have held to be noncontemp-
tuous, being specifically Exhibits "B," "C," "E,"
and "F," attached to the affidavit of George M.

24 Ariz.—35

Elledge, and that the writ should be quashed so far as it concerns proceedings to be had based upon the publications attached to said affidavit, being specifically Exhibits "A" and "D."

ROSS, C. J., and McALISTER, J., concur.